# IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
# AT NASHVILLE
## October 17, 2000 Session

## STATE OF TENNESSEE v. LARRY COULTER

**Direct Appeal from the Circuit Court for Rutherford County**
**No. F-43611     J. Steve Daniel, Judge**

---

**No. M1999-00784-CCA-R3-CD - Filed June 26, 2001**

---

The appellant, Larry Coulter, appeals his conviction by a jury in the Rutherford County Circuit Court of one count of first degree premeditated murder. For his offense, the appellant received a sentence of life imprisonment in the Tennessee Department of Correction. In this appeal, the appellant presents the following issues for our review: (1) whether the trial court erred in failing to disqualify the office of the District Attorney General for the Sixteenth Judicial District from participating in the appellant's case; (2) whether the trial court erred in denying the appellant's pre-trial motion to suppress a statement that he made to officers of the La Vergne Police Department following his offense; (3) whether the trial court erred in denying the appellant's pre-trial motion to suppress the fruits of a warrantless search of his home by officers of the La Vergne Police Department; (4) whether the trial court erred in denying the appellant's pre-trial motion to exclude from evidence notes and letters written by the appellant to the victim prior to this offense; (5) whether the trial court erred in denying the appellant's pre-trial motion to exclude from evidence any proof of the victim's plans to move away from the Coulters' mobile home; (6) whether the trial court erred in overruling the appellant's objection to testimony by Sybil Victory concerning a telephone conversation; (7) whether the trial court erred in overruling the appellant's Tenn. R. Evid. 615 objection to testimony by Fawn Jones; (8) whether the trial court erred in overruling the appellant's objection to testimony by the State's firearms identification expert concerning a bullet recovered from the victim's body; (9) whether the trial court erred in permitting each member of the jury to "dry-fire" the murder weapon during the State's case-in-chief; (10) whether the trial court erred in permitting a State's witness to testify by deposition pursuant to Tenn. R. Crim. P. 15; (11) whether the trial court erred in permitting the State to impeach the appellant's psychologist with a "learned treatise" without satisfying the requirements of Tenn. R. Evid. 618; (12) whether the trial court erred in overruling the appellant's objection to rebuttal testimony by the State's psychologist that violated Tenn. R. Crim. P. 12.2(c); (13) whether the trial court erred in failing to charge the jury with certain special instructions requested by the appellant; (14) whether the trial court erred in permitting the State to alter or amend an exhibit immediately prior to the jury's deliberations; (15) whether the evidence adduced at trial is sufficient to support the jury's verdict; and (16) whether the cumulative effect of any errors requires the reversal of the appellant's conviction and the remand of this case for a new trial. Following a review of the record and the parties' briefs, we affirm the judgment of the trial court.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Circuit Court is Affirmed.**

NORMA MCGEE OGLE, J., delivered the opinion of the court, in which THOMAS T. WOODALL and ROBERT W. WEDEMEYER, JJ., joined.

Darrell L. Scarlett and Michael A. Myers, Murfreesboro, Tennessee, for the appellant, Larry Coulter.

Paul G. Summers, Attorney General and Reporter; Lucian D. Geise, Assistant Attorney General; William C. Whitesell, Jr., District Attorney General; and J. Paul Newman, Assistant District Attorney General, for the appellee, State of Tennessee.

## OPINION

### Factual Background

On January 6, 1998, a Rutherford County Grand Jury indicted the appellant, Larry Coulter, for first degree premeditated murder. The indictment arose from the shooting death of the appellant's wife, Robin Coulter, on December 3, 1997, at the Coulters' mobile home in La Vergne, Tennessee. At the appellant's trial, the State established that the appellant and his wife had been married for approximately two years. The Coulters had no children together, although Ms. Coulter had a son by a prior relationship who was living with his grandmother at the time of this offense. Both of the Coulters were employed, the appellant as a security guard by a local company named Brentwood Security and Patrol and Ms. Coulter as a clerk by a local market known as "The Pantry."

Tommy Thompson, the owner of Brentwood Security and Patrol, testified on behalf of the State at the appellant's trial. Thompson stated that, at the time of this offense, the appellant had attained the rank of "captain" in Thompson's company. The appellant's duties included the supervision of three or four patrol officers in addition to several officers assigned to stationary posts. Thompson further testified that, due to his employment as a security guard, the appellant possessed a "written directive" to carry a Taurus .38 Special revolver, was trained in the use of the Taurus .38 Special revolver, and was qualified as a "police sharpshooter." According to Thompson, the appellant did "an excellent job" for Brentwood Security and Patrol.

However, Thompson also recalled that, prior to the instant offense, the appellant informed Thompson that he was experiencing marital difficulties and complained to Thompson concerning his lack of sexual relations with his wife. Moreover, approximately two weeks prior to his offense, the appellant exhibited a "change of attitude" at work. Mack Rinehart, III, another employee of Brentwood Security and Patrol, specifically recalled that, during the weeks immediately preceding Ms. Coulter's murder, the appellant appeared to be "just a little bit down" and was "more or less silent."

Christopher Alexander, a lieutenant with Brentwood Security and Patrol, confirmed at the appellant's trial that, prior to Ms. Coulter's murder, the appellant was complaining of marital

difficulties. According to Alexander, the appellant appeared to be very bitter about his relationship with his wife and frequently referred to his wife as a "b**ch." Alexander further recalled:

> [W]ithin the last three months of [his wife's] life, [the appellant] would make statements to myself and other people to the fact that she was giving him a hard time. And the statements he would make, If she tries to take my trailer, I'll kill the b**ch. If she tries - - I'm getting tired of her. She won't leave me alone. I can't get no rest. I think I'll just go on and kill the b**ch.

Alexander stated that he was so troubled by the appellant's threats to kill Ms. Coulter that he visited the appellant's wife at her workplace one evening, informed her about the appellant's threats, and "warn[ed] her that she might not want to push [the appellant]."

Two more co-workers of the appellant, Baron Hightower and Robert Cadwallader, likewise testified that, on several occasions prior to killing Ms. Coulter, the appellant voiced his dissatisfaction with his marriage. Specifically, the appellant expressed to his co-workers doubts concerning his wife's fidelity.

Michael Hills, Ms. Coulter's fifteen-year-old son, also testified at the appellant's trial. Hills recounted that he lived with his mother and stepfather for approximately one year until June 15, 1997. He recalled that, during much of this time, his mother and stepfather communicated primarily through notes or letters, and, approximately six months prior to Hills' departure, they "discontinued sleeping together." Moreover, as a further example of the ongoing discord between his mother and stepfather, Hills testified that the appellant did not permit his mother to use the telephone in their home "freely." According to Hills, the appellant informed his wife that the telephone "was in his name and she wasn't allowed to use it."

Sybil Victory, a friend of Ms. Coulter, related to the jury that, at the time of the appellant's offense, she had known Ms. Coulter for approximately three years. During that time, Victory had never met the appellant, spoken with the appellant, nor visited the Coulters' home. However, in June or July 1997, Victory telephoned her friend "at home." A man initially answered the telephone before surrendering the receiver to Ms. Coulter. During her ensuing telephone conversation with Ms. Coulter, Victory could hear the same man screaming at Ms. Coulter in the background. Victory recalled that "[the man] was yelling at [Ms. Coulter] in the background, that she was not allowed to have phone calls, that was his phone, and he was yelling obscenities at her." According to Victory, Ms. Coulter referred to this man as "Larry" during the telephone conversation. Victory further noted that, on the day following this telephone conversation, Ms. Coulter purchased a pager by which friends and family members could contact her.

Fawn Jones, a co-worker of Ms. Coulter at the Pantry, testified on behalf of the State that, immediately prior to this offense, Ms. Coulter asked Jones for assistance in moving Ms. Coulter's belongings from the mobile home that she shared with the appellant to a new apartment. Michael Hendrickson, an employee of Wherry Housing Cooperative in Smyrna, Tennessee, confirmed that, on December 2, 1997, Ms. Coulter signed a lease for an apartment at the

Cooperative, paid the necessary deposits, and paid one month's rent. Ms. Coulter listed only herself and her son as occupants of the apartment.

Additionally, the State introduced into evidence a video cassette recording of a deposition of Rob McVicker, the Director of the Legal Affairs Division of the Domestic Violence Program, Inc., in Murfreesboro, Tennessee. During the deposition, McVicker testified that, on December 1, 1997, Ms. Coulter sought assistance from the Program and, consequently, filed a petition in the Rutherford County Chancery Court requesting an order of protection against the appellant. According to McVicker, the court granted Ms. Coulter's petition.

Sandra Jenkins, an employee of the Rutherford County Chancery Court, confirmed that, upon Ms. Coulter's petition, Judge James Clayton, Jr., signed an ex parte order of protection against the appellant on December 2, 1997. Thomas Whittaker Davis, an officer with the Rutherford County Sheriff's Department, further verified that he served the appellant with the ex parte order in the early afternoon of December 3, 1997.

At approximately 6:34 p.m. on the evening of December 3, 1997, the appellant walked into the lobby of the La Vergne Police Department and informed the dispatcher, Cassandra Lowery, that he had just killed his wife. Lowery testified at the appellant's trial that the appellant appeared to be lucid, albeit somewhat distraught, and there was "blood spatter" on his t-shirt. Because there were no other officers present at the police station, Lowery immediately radioed for assistance. Stace L. Thompson, an officer with the Criminal Investigation Division of the La Vergne Police Department, arrived at the station soon thereafter.

Thompson testified that, upon his arrival, he immediately approached the appellant. In response to Thompson's questioning, the appellant reiterated that he had killed his wife and also disclosed that his wife was currently at the Coulter's mobile home. At this point, Thompson briefly searched the appellant for weapons, handcuffed him, and escorted him to a patrol car. The appellant in turn directed Thompson to his home, where the officer discovered Ms. Coulter's lifeless body lying on the bed in her bedroom. A Taurus .38 Special revolver was lying on a table in the kitchen.

Nick Watson, a detective with the La Vergne Police Department, testified that he too was dispatched to the appellant's mobile home on the evening of the murder. According to Watson, his "primary duty was to look at the crime scene and look around Ms. Coulter's bedroom." In performing this task, Watson also collected evidence, including among other items the Taurus .38 Special revolver located on the kitchen table and the pillows and pillow cases located on Ms. Coulter's bed. Watson noted that the cylinder of the revolver contained two empty shell casings and four live rounds. Moreover, when paramedics moved Ms. Coulter's body, the police discovered a spent bullet in the box springs of Ms. Coulter's bed, near the headboard. Watson subsequently obtained a second spent bullet from the medical examiner who performed the autopsy of Ms. Coulter. The detective submitted the Taurus .38 Special revolver, the two empty shell casings, and the two spent bullets to the Tennessee Bureau of Investigation (TBI)'s crime laboratory in Donelson,

-4-

Tennessee. However, he acknowledged at trial that, after the TBI completed its testing, at least one of the spent bullets and the pillows and pillowcases seized from Ms. Coulter's bed were lost.

Watson further testified that, several days following the appellant's offense, the police obtained a warrant to search the appellant's home. Among the items seized pursuant to the warrant was a receipt reflecting the appellant's purchase of the Taurus .38 Special revolver in 1996. Moreover, the police seized notes and letters that were written by the appellant and addressed to his wife. Some of these letters were undated, but others were dated July, August, September, and October 1997. In the letters, the appellant complained about Ms. Coulter's refusal to engage in sexual relations with him and her alleged infidelity. Additionally, the appellant discussed Ms. Coulter's plans to leave him. In this regard, he occasionally expressed impatience that she had not yet found another place to live, inquiring on one occasion, "Why are you still here? . . . Why can't you just pack your things and go away!? Why must you stay!" Alternately, the appellant expressed anger that Ms. Coulter was "collecting boxes, getting newspapers and calling about places to live." Primarily, the appellant begged Ms. Coulter to remain with him and continue their marriage, indicating that he could not live without her.

Harry E. Hollins, a sergeant with the La Vergne Police Department, testified at the appellant's trial that he was dispatched to the appellant's mobile home at approximately 7:00 p.m. on the evening of this offense, arriving sometime after Detective Watson. Following his arrival, Hollins assumed the task of photographing the crime scene. As he performed this task, Hollins particularly noted that there were several boxes in Ms. Coulter's bedroom, and clothing was lying "around the room," apparently having been removed from closets or dressers. Hollins subsequently observed that Ms. Coulter's car, which was parked outside the mobile home, also contained clothing.

Later on the evening of the offense, Hollins returned to the police station and, along with Officer Thompson, conducted an audio taped interview of the appellant. At trial, the State played the audio cassette recording of the interview for the jury. According to the recording, the appellant conceded during the interview that, prior to the murder, he and his wife were experiencing marital difficulties. In this regard, the appellant noted that he and his wife had always slept in separate bedrooms, but, one year prior to the murder, his wife informed him that she no longer loved him. Moreover, approximately four months prior to the murder, the appellant discovered sexually explicit letters written by his wife. On the basis of these letters, the appellant suspected that his wife was engaged in a sexual liaison with another man. Despite persistent questioning by the appellant during the ensuing months, Ms. Coulter refused to explain the letters. Rather, Ms. Coulter repeatedly stated to the appellant her intention to leave him as soon as she was financially able to support herself. She also informed the appellant that she would obtain a restraining order against him when she moved.

The appellant additionally confirmed that, on December 3, 1997, while Ms. Coulter was at work, a police officer visited the Coulters' home and served him with an ex parte order of protection issued on behalf of Ms. Coulter. Upon serving the appellant with the ex parte order, the officer recommended to the appellant that he temporarily leave his home until the court hearing on

the order of protection.  The officer explained that, if the appellant remained in the same home with his wife, he would be vulnerable to false accusations by his wife of threatening or assaultive behavior and to consequent arrest.

According to the appellant, he was frightened by the officer's comments.  Therefore, following the officer's departure, the appellant telephoned his workplace in order to find out if he could live at the company's headquarters for several days.  The company's owner, however, was not available.  Therefore, the appellant left a message for his employer and went to his bedroom, where he slept until 5:30 p.m.

When the appellant awakened, his wife had returned home.  The appellant briefly confronted her concerning the order of protection, after which encounter Ms. Coulter went to her bedroom and slept, and the appellant returned to his own bedroom.  In his bedroom, the appellant opened his closet and removed his gun from the "duty belt" that he wore while at work.  He briefly considered whether or not he should replace the gun in the duty belt and go to work.  Instead, he placed the gun on a table and reflected upon his wife's behavior.  The appellant especially felt betrayed by Ms. Coulter's acquisition of an order of protection.  As the appellant continued to reflect upon Ms. Coulter's betrayal, he smoked several cigarettes and drank several sodas.  He also picked up his gun and laid it down several times.

Finally, the appellant picked up his gun, obtained a pillow from his bed, and walked to his wife's bedroom.  The bedroom was dark.  Yet, instead of turning on the lights, the appellant approached his wife's bed, visualized his wife's head, placed the pillow on what he believed to be his wife's head, and placed the gun against the pillow.  According to the appellant, he could feel the trigger of the gun.  He then heard a "pop," whereupon Ms. Coulter began screaming, and the appellant felt something strike his legs.  The appellant asserted during the interview that, at this point, he could no longer feel the gun in his hand and was unsure of the location of the pillow.  The appellant heard a second "pop" before running to the kitchen.

In the kitchen, the appellant placed the gun on a table and sat down for several moments.  Afterwards, he returned to his wife's bedroom and turned on the lights.  His wife appeared to be dead; therefore, he retrieved his gun and returned to his own bedroom, where he smoked another cigarette and contemplated suicide.  Ultimately, however, the appellant decided to surrender to the police.  He put on his shoes, placed the gun on the kitchen table once more, and drove to the police station.

During the audio taped interview, the appellant asserted his belief that he had murdered his wife because he had "snapped or something [-] it just . . . all pilling up on me and I just went bazirk."  The appellant explained:

Cause like I said I was feeling a lot of emotions I was scared I was angry uh I just didn't know which way to turn and I was probably not man enough to take a hold of my emotions and uh done the wrong thing.

Dr. Charles Warren Harlan, the acting medical examiner for Rutherford County, testified at trial that he performed the autopsy of Ms. Coulter. Dr. Harlan related that Ms. Coulter suffered two entry gunshot wounds to the head and one exit gunshot wound to the neck. One of the entry gunshot wounds was located on Ms. Coulter's left cheek. The bullet that caused this wound exited Ms. Coulter's body on the anterior right side of her neck. Dr. Harlan noted that the gunshot wound to the victim's left cheek did not possess the characteristics of a "close" or "contact" gunshot wound. However, he emphasized that the presence of an "intervening or intermediary material," such as a pillow, between the gun and Ms. Coulter's head might explain the absence of such characteristics. Dr. Harlan also observed that "[t]his particular bullet struck no vital structure." Indeed, he noted that, "[f]ollowing receipt of [the wounds to Ms. Coulter's left check and neck] . . . there would be no loss of physical ability for mobility, for the ability to walk, talk, etc." He also opined that Ms. Coulter would have been capable of screaming following the infliction of these wounds.

As to the second entry gunshot wound, Dr. Harlan testified that this wound was located on the back of Ms. Coulter's head. According to Dr. Harlan, this gunshot wound did possess the characteristics of a contact gunshot wound. Moreover, the bullet that caused this wound passed through significant portions of Ms. Coulter's brain and caused her death. Because this bullet was still lodged in Ms. Coulter's brain at the time of the autopsy, Dr. Harlan was able to recover the bullet and provide it to the police.

Donald Carman, a special agent employed by the TBI at its crime laboratory in Donelson, Tennessee, testified on behalf of the State that he specializes in forensic firearms identification and that he examined the Taurus .38 Special revolver recovered from the kitchen table in the appellant's home, the spent bullet recovered from the box springs of Ms. Coulter's bed, and the spent bullet recovered from Ms. Coulter's brain. Upon testing the evidence, Carman determined that both bullets had been fired from the Taurus .38 Special revolver.

Carman further testified that the Taurus .38 Special revolver appeared to be functioning properly and could be fired "single action" or "double action." He explained:
> Single action . . . mean[s] that I manually pull back on the hammer until it is cocked, then I pull the trigger like that. You could fire it that way. That's single action.
>
> Double action would be where I just pull through the trigger itself.

Carman observed that, in order to fire the weapon "single action," a person would need to apply four and one-half pounds of pressure to the trigger. In contrast, in order to fire the weapon "double action," a person would need to apply a little more than twelve pounds of pressure to the trigger.

The appellant did not testify on his own behalf at trial, nor did he present evidence refuting the State's claim that he had killed his wife. Rather, he attempted to demonstrate that, as a result of a mental defect, he did not possess the mental state necessary to commit the offense of first degree premeditated murder. In this regard, the appellant presented the testimony of Hershel

Dean Wolfe, a friend and former co-worker. Wolfe testified that, in 1992, he and the appellant were employed as aircraft mechanics at "Cross Continent." While at work, the appellant fell fifteen or twenty feet from scaffolding and hit his head against a concrete floor, suffering severe injuries. Wolfe noted certain changes in the appellant following the accident:

> Well, I'll tell you, Larry is an even person. It's hard to tell the difference before and after. Only he had some withdrawal. He had depression, and he complained a lot about headaches and his pain that he was having in his hands and the loss of the feeling that he had in his hands.

Wolfe further recalled that, following the accident, the appellant was less able to concentrate and appeared to be suffering memory deficits. However, the appellant "did not evidence hallucinations, delusions, or bizarre behavior," nor did the appellant experience any blackouts.

Following the appellant's offense in this case, Wolfe visited his friend in jail. According to Wolfe, the appellant stated during the visit that he could not recall the murder, but, "when [he] came to from blacking out[,] . . . [Ms. Coulter] was dead and . . . the gun was on the table, so he figured he must have shot her." The appellant additionally informed Wolfe that he was hearing voices and was experiencing dreams and visions, including seeing a "dark man."

Judy Marie Prince, an ex-wife of the appellant, also testified on his behalf. She recounted that she was married to the appellant for four years, divorcing him in 1992. Prince asserted that the appellant was a good husband. She recalled:

> He was very kind, very loving. I could go to the grocery store and come home, and he would have gone out and bought flowers and some other little gift, and it would be waiting for me on the table. We did things together. We were very close. Wherever I went, he usually went. It was very rare that he would let me go to the grocery store by myself. He always went with me. So we were just kind of one together.

Prince conceded that, during her marriage to the appellant, he was very "jealous of [her] time," including the time that she spent with her children from a prior relationship. Moreover, the appellant discouraged her from visiting other family members, again demanding her undivided attention. Nevertheless, Prince maintained that the appellant never argued with her during their marriage. Prince explained that the appellant was "very timid and like he was beat down. And he wouldn't even voice his opinion. Even if he didn't like something, he wouldn't voice his opinion." Instead, the appellant expressed his anger or discontent by "tighten[ing] the lids on [Prince's] Coke bottle[s]." Ultimately, Prince divorced the appellant because he was not adequately mature and stable. According to Prince, the appellant opposed their divorce and begged Prince to remain with him but never threatened her with violence.

The appellant's accident at "Cross Continent" and his resultant head injury occurred following Prince's divorce from the appellant. Nevertheless, upon the appellant's release from the

hospital, Prince cared for the appellant for several months. Prince recounted that, like Wolfe, she noticed certain changes in the appellant. She related to the jury:

> I think the biggest [change] was his memory. And then his - - I don't know if it was impatience or intolerance or he couldn't wait. He acted impulsively. And then he couldn't remember.

Prince testified concerning several specific incidents in which the appellant uncharacteristically engaged in impulsive shopping. However, Prince acknowledged that, at the time of the murder, she had not seen the appellant for approximately one year and had not spoken with the appellant on the telephone for six months.

Sonya Craig, Prince's daughter, also testified at the appellant's trial. She recalled that, during her mother's marriage to the appellant, she lived with them for approximately one and one-half years. She observed that, during this time, she never heard the appellant threaten anyone with physical harm or even raise his voice. Rather, the appellant was "passive" and generally withdrew to his room whenever he was angry. In particular, Craig noted that, when she lived with her mother and the appellant, she had a mentally handicapped child, and the appellant was able to interact with the child without becoming frustrated. Craig conceded that she had not seen or spoken with the appellant since "shortly after his accident at work."

Finally, the appellant presented the testimony of Judith Weiss, a licensed clinical psychologist specializing in neuropsychology. According to Dr. Weiss, the appellant was referred to her in 1993 because he had been denied workers' compensation for a closed head injury that he claimed to have suffered when he fell twenty feet from scaffolding at his workplace. Dr. Weiss noted that the Diagnostic and Statistical Manual of Mental Disorders classifies closed head injuries as mental defects. However, she recalled that, at the time of her evaluation, the appellant had not been examined by a neurologist. Accordingly, "there [was] no documented medical record of any brain injury." Nevertheless, upon evaluating the appellant, Dr. Weiss diagnosed a closed head injury. Due to Dr. Weiss' diagnosis, the appellant was awarded workers' compensation.

With respect to closed head injuries, Dr. Weiss related to the jury that they invariably entail some damage to the brain's frontal lobe and to the frontal tips of the brain's temporal lobes. Moreover, she testified that closed head injuries are associated with "a shearing or tearing of little fibers throughout the brain," including the subcortical or "inner part" of the brain, and frequently produce neurochemical imbalances. Due to these common results of closed head injuries, people suffering such injuries exhibit similar symptoms.

Providing examples, Dr. Weiss noted that, because the frontal lobe "is the part of our brain that is responsible for judgment and forethought," individuals with closed head injuries "can lose a significant amount of reasoning and judgment." She further remarked that, because the temporal lobes "are responsible for storing memory," such individuals often suffer "memory problems." Additionally, due to "the shearing of . . . fibers," people with closed head injuries suffer "[h]eadaches, irritability, sensitivity to noise, sensitivity to light." Finally, Dr. Weiss testified that neurochemical imbalances may manifest as labile or unstable emotions, depression, anxiety, and

withdrawal. Indeed, depending upon the kind of neurochemical imbalance, a person may suffer a "wide range of problems, ranging from depression to eating disorders to alcoholism to psychotic disorders, schizophrenia." In particular, she observed that neurochemical imbalances may contribute to impulsive behavior:

> Just to react to some circumstance at the moment without thinking about it is more common in someone who's had a closed head injury than to sit down and say if I do this, this is going to happen; if I do this, this will happen. It's more likely that one does something and then looks at one's hand and says what did you do.

Dr. Weiss assured the jury that, prior to diagnosing the appellant with a closed head injury, she interviewed the appellant on two occasions: March 24, 1993, and March 30, 1993. During these interviews, Dr. Weiss obtained information concerning the appellant, including his "lengthy history of successful employment," the details of his accident at "Cross Continent," and the impact of the accident upon his life, including his daily activities. She also administered various psychological tests, including the Wechsler Adult Intelligence Scale-Revised (WAIS-R), the Woodcock-Johnson Test of Cognitive Ability-Revised, the Peabody Picture Vocabulary Test-Revised, the Detroit Test of Learning Aptitude-Revised, the Goldman-Fristoe-Woodcock Test of Auditory Discrimination, the Wide Range Achievement Test-Revised, the Peabody Individual Achievement Test-Revised, the Halstead-Reitan Neuropsychological Battery, and the Sixteen Personality Factor Test.

Dr. Weiss conceded that the appellant performed well on a majority of the psychological tests. However, she asserted that specific aspects of the appellant's performance supported her diagnosis of a closed head injury. For example, on the WAIS-R, the appellant achieved a full-scale intelligence quotient (I.Q.) of ninety-three (93) or average. Yet, there was a disparity of twenty-four points between the appellant's verbal intelligence quotient, which was eighty-three (83) or "low average," and his performance intelligence quotient, which was 107 or average. Dr. Weiss observed that such a significant disparity was unusual in an "unimpaired" person, and the disparity suggested a "loss" in the appellant's verbal intelligence quotient.

Dr. Weiss also cited the appellant's performance on specific subtests of the WAIS-R in support of her diagnosis. While acknowledging that the appellant performed at a "high average" level on subtests measuring logical sequencing and puzzle construction, Dr. Weiss noted that the appellant experienced difficulty on the portion of the scale that measures "common sense reasoning." Moreover, the appellant experienced significant difficulties in completing the subtest measuring "mental arithmetic," difficulties that could reflect short-term memory deficits. Finally, the appellant experienced difficulty reproducing "block designs," even though "you would expect a mechanic to do extremely well, above average." According to Dr. Weiss, people with "some form of central nervous system dysfunction, some form of brain damage, can have a great deal of difficulty with [the block design] test."

-10-

The academic achievement tests also produced mixed results. The tests measured the appellant's reading comprehension as "average for an adult." In contrast, the appellant performed in the bottom sixth percentile of test subjects in reading words aloud out of context, in the bottom fifth percentile in spelling, and in the bottom third percentile in arithmetic.

Similarly, on the Woodcock-Johnson Test of Cognitive Ability-Revised, the appellant performed at the highest possible level in following oral directions accompanied by a visual component, yet performed at the level of a nine-year-old in simply repeating words. Moreover, the appellant's

> performance initially in . . . repeating . . . sentences was at the six year old level and the fourth percentile for someone his age, so that 96 percent of people his age at the time I tested him would have done better in repeating sentences.

Dr. Weiss opined that these test results also reflected cognitive dysfunction.

Finally, the appellant performed well overall on the Halstead-Reitan Neuropsychological Battery. However, Dr. Weiss noted that this battery of tests "was developed to look at the outer surface of the brain, not subcortical damage." She explained that, therefore, the battery of tests is not particularly sensitive to closed head injuries. She further remarked that the test in the battery that is most sensitive to such injuries is the Seashore Rhythm Test, which measures "sustained auditory attention span, . . . how well you can listen over a period of time." Dr. Weiss related that the appellant experienced difficulties with this test "suggestive of problems with . . . central auditory processing disorder, that the subcortical portions of the brain that deal with auditory information are not working well as a result of the injury. And, therefore, auditory input is not handled well by the brain." The results of the Goldman-Fristoe-Woodcock Test of Auditory Discrimination also "supported the presence of subcortical contribution to inability to handle auditory information."

Dr. Weiss testified that people with closed head injuries may or may not get better over time; however, "[h]istorically, reason and judgment and memory are the most difficult to rehabilitate." Moreover, Dr. Weiss testified that she interviewed the appellant again in 1999 following this offense, although she did not re-administer any psychological tests, nor did she interview the police or the appellant's co-workers, friends, and family members. She also reviewed a report by Samuel N. Craddock, the State's psychologist, concerning his recent evaluation of the appellant. Dr. Weiss concluded that the appellant "continues to be impulsive and to use poor judgment, to be irritable, to be withdrawn." She stated that it was "highly improbable [that] he acts with reflection and judgment." Instead, "[the appellant] responds to things in the environment at the moment without thinking about aftermath."

Accordingly, Dr. Weiss opined that it was "improbable" that the appellant was acting with reflection and judgment at the time that he killed his wife. Indeed, she noted that the appellant informed her during the 1999 interview that, at the time of this offense, "he basically went into automatic pilot and really is not sure of how anything happened in terms of the shooting." She

asserted that this claim was consistent with statements made by the appellant during his audio taped interview with the police.

In rebuttal of Dr. Weiss' testimony, the State presented the testimony of Dr. Craddock, a forensic psychologist at the Middle Tennessee Mental Health Institute (MTMHI). Dr. Craddock testified that, following the instant offense, the appellant was admitted to MTMHI for four days because he claimed to be experiencing depression and had threatened violence both to himself and to other individuals. The appellant was provided medication and returned to the jail. Subsequently, on October 27, 1998, the appellant was again admitted to MTMHI. On this occasion, the court ordered Dr. Craddock to perform a forensic evaluation of the appellant in order to determine both the appellant's competency to stand trial and his mental condition at the time of the instant offense. The appellant stayed in the residential unit at MTMHI for twenty-four days.

In conducting a forensic evaluation of the appellant, Dr. Craddock was joined by other members of the staff at MTMHI, including Dr. Rokeya Farooque, a psychiatrist; Rebecca Smith, a social worker; and several nurses who recorded their observations of the appellant during his stay in the residential unit. In addition to their own observations, members of the evaluation team collected information from sources including the appellant, the appellant's co-workers, the appellant's acquaintances or friends, the appellant's mother, and the police. Dr. Craddock also listened to the audio cassette recording of the appellant's interview with the police. Moreover, Dr. Craddock administered several psychological tests. He administered the Shipley Institute of Living Scale, a test designed to measure vocabulary, reading comprehension, and reasoning. He administered the Trail Making Test and portions of the Halstead-Reitan Neuropsychological Battery, both of which are sensitive to cerebral "insult" or damage. He administered the Milan Clinical Multi-Axial Inventory and the Personality Assessment Inventory, tests designed to detect personality disorders. Finally, Dr. Craddock reviewed information that he had received from Dr. Weiss, including the results of the Minnesota Multiphasic Inventory, Second Edition (MMPI-II), that Dr. Weiss administered to the appellant on July 4, 1998.

As to the results of the psychological testing, Dr. Craddock confirmed that the appellant possesses average or near-average intelligence but, at the time of the forensic evaluation, was also exhibiting symptoms of a "mental defect." Thus, Dr. Craddock agreed with Dr. Weiss' diagnosis of a closed head injury and further agreed that the appellant had thereby suffered some impairment in reasoning and judgment. Specifically, Dr. Craddock noted that the Shipley Institute of Living Scale measured the appellant's reasoning at an eleven-year-old level. Dr. Craddock recalled that the appellant "made a good effort on the test sensitive to brain damage. I don't think he was trying to be deceptive in that respect."

Dr. Craddock also testified that, at the time of the forensic evaluation, the appellant appeared to be suffering a "mental disease." Specifically, Dr. Craddock diagnosed the appellant with an "adjustment disorder." Moreover, Dr. Craddock observed in the appellant "[p]resent features of anxiety and depression as well as features of a personality disorder with passive/aggressive, self-defeating, and schizoid components." However, the psychologist opined that, in contrast to the

appellant's "effort on the test sensitive to brain damage," the appellant exaggerated symptoms on the tests designed to detect personality disorders.

Dr. Craddock noted that, notwithstanding any mental disease or defect, the appellant's behavior while residing at MTMHI was "unremarkable," and the appellant experienced no difficulties interacting with either members of the staff or other inmates. Indeed, Dr. Craddock remarked that the appellant demonstrated "good judgment" by avoiding confrontations with other inmates who were "mentally disturbed" or had "a history of acting out." Dr. Craddock further recalled:

> I didn't see any bizarre behavior. He was polite with me. He was cordial. I thought we established a good rapport. . . . I did not hear him express complaints. He seemed to be able to live with our policies and, I enjoyed working with him.

Dr. Craddock elaborated that the appellant did not appear to be experiencing hallucinations during his stay at MTMHI, nor did he complain of hallucinations. Rather, the appellant appeared to be alert and oriented and made lucid and coherent statements to the psychologist.

Dr. Craddock concluded that, despite any mental disease or defect, the appellant "was functioning within normal expectations or bounds" at the time of the instant offense and possessed the capacity to form the requisite mental state, i.e., intent and premeditation. Dr. Craddock conceded that he "was not saying whether he exercised that capacity. I'm saying he possessed the capacity."

Rokeya Farooque, the psychiatrist employed by the forensic services unit of MTMHI, also testified on behalf of the State. Dr. Farooque confirmed that she participated in the evaluation of the appellant. She recalled that, while residing at MTMHI, the appellant complained of difficulty sleeping and of dreams. However, she observed:

> Mr. Coulter was very cooperative, pleasant with us. Whenever we interviewed, he talked coherently without any problem. He gave us whatever question we asked. He did not have any problem while he was with us or while he was in the unit. He was cooperative with us and talked about his dream problems, sleeping problems, that I treated with Vistaril.

Due to the appellant's claims of a closed head injury, Dr. Farooque additionally ordered an electroencephalogram (EEG) and a CT scan of the appellant's head. Both the EEG and the CT scan yielded results within normal ranges. In sum, Dr. Farooque concurred in Dr. Craddock's conclusions.

At the close of the trial and following deliberations, the jury returned a verdict of guilt of first degree premeditated murder. Because the State sought neither the death penalty nor a sentence of life imprisonment without parole, the trial court sentenced the appellant to life imprisonment in the Tennessee Department of Correction.

## II. Analysis

**a.		Motion to Disqualify the District Attorney General's Office**

In appealing his conviction of first degree premeditated murder, the appellant first challenges the trial court's denial of his pre-trial motion to disqualify the office of the District Attorney General for the Sixteenth Judicial District from prosecuting his case. The appellant asserts that "the Trial Court's ruling was fundamentally unfair, inappropriate and casts doubt over the fairness of the entire proceeding and the entire judicial process if allowed to stand." In support of his claim, the appellant notes that his original attorney in this case was William Osborne, an assistant district public defender for the Sixteenth Judicial District, and that, prior to the appellant's trial, Osborne accepted employment with the District Attorney General's office in the same judicial district. The State responds that the District Attorney General's office utilized adequate procedures to insulate Osborne from the appellant's case. We must agree with the State.

**1.		Trial Court Proceedings**

The appellant filed his disqualification motion on October 8, 1998, and the trial court conducted an evidentiary hearing on the motion on December 7, 1998. At the evidentiary hearing, the appellant presented the testimony of Gerald Melton, the District Public Defender for the Sixteenth Judicial District. Melton confirmed that his office was initially appointed to represent the appellant in this case. According to the record, the appointment occurred on January 8, 1998. Melton additionally recalled that he assigned the appellant's case to William Osborne, an assistant employed by his office, and also agreed to act as co-counsel.

Melton maintained that, during the course of Osborne's representation of the appellant, the attorney received confidential or privileged communications from the appellant, which communications Osborne recorded in the appellant's case file. In this regard, Melton emphasized that Osborne was the lead attorney in the appellant's case:

> [Osborne] . . . undert[ook] the interviews with Mr. Coulter. I don't recall that I . . . ever met Mr. Coulter. . . . My primary involvement [was] working with Mr. Osborne to do things toward the defense. We collaborated with one another at different times and talked about the facts of the case and talked about areas in which we would pursue a defense, the possibility of various expert services, and things of this nature.

Additionally, the record reflects that Osborne filed several motions with the Rutherford County Circuit Court on behalf of the appellant, including a motion for a bill of particulars, a motion for discovery, and a motion for a mental evaluation of the appellant. Osborne also filed a notice of the appellant's intent to introduce expert testimony concerning his mental condition at the time of this offense.

According to Melton, Osborne left the District Public Defender's office in September 1998 in order to accept a position as an assistant district attorney general with the office of the District Attorney General for the Sixteenth Judicial District. At that time, Melton and Osborne discussed the potential development of conflicts of interest in numerous cases, including the instant case. Moreover, at the request of the District Public Defender's office, the trial court permitted that

office to withdraw from representation of the appellant and appointed attorney Darrell Scarlett to represent the appellant. Melton explained that his office was concerned about a possible appearance of impropriety due to Osborne's employment by the District Attorney General's office. The trial court's order appointing Darrell Scarlett includes the following notation: "Due to a conflict with the District Public Defender, the above Attorney is appointed."

In addition to Melton's testimony, the appellant presented the testimony of David Jones, the Rutherford County Building Official. Jones testified that the District Attorney General's office occupied space on the third floor of the "Judicial Building." According to Jones, this space consisted of 2,111 square feet.

In rebuttal, the State presented the testimony of William Osborne, the appellant's former attorney. Osborne confirmed that, from June 1, 1996, until August 29, 1998, he was an assistant district public defender in the Sixteenth Judicial District. He also confirmed that he initially represented the appellant in the instant case and received confidential or privileged communications from the appellant during the course of his representation. Finally, he confirmed that, on August 31, 1998, he accepted a position as an assistant district attorney general in the same judicial district.

With respect to his change of employment, Osborne recalled that, prior to being sworn in as an assistant district attorney general, he engaged in discussions with both Melton and the District Attorney General, William C. Whitesell, Jr., concerning the procedures required to avoid any conflicts of interest or any appearance of impropriety. Due to these discussions, Whitesell determined that he would not assign Osborne to prosecute cases in the Rutherford County Circuit Court, the court in which Osborne had provided representation as an assistant district public defender. Moreover, on September 1, 1998, the day on which Osborne was sworn in as an assistant district attorney general, Whitesell authorized Osborne's circulation of a memorandum to the attorneys and other staff members of the District Attorney General's office. In this memorandum, Osborne alerted staff members to his employment by the District Attorney General's office and to the danger of conflicts of interest due to his prior employment as an assistant district public defender. Specifically, Osborne acknowledged his continuing duty to preserve the confidences of his former clients. He also advised staff members of the need to shield him from exposure to any cases pending in the Rutherford County Circuit Court in which he had participated as an assistant district public defender or in which the District Public Defender's office had participated during Osborne's employment by that office. Osborne concluded in the memorandum that any discussions pertaining to those cases should be conducted outside his presence and that he should be denied access to the files in those cases.

Osborne additionally testified that, since becoming an assistant district attorney general, he had not discussed the appellant's case with anyone other than the appellant's new attorney, nor had he seen the prosecution's file in the appellant's case. Indeed, Osborne asserted that he had had no contact with anyone in the District Attorney General's office concerning the appellant's case. He conceded that he frequently encountered the prosecutors assigned to the

-15-

appellant's case. He noted, however, that his office and the office of J. Paul Newman, the principal prosecutor in the appellant's case, were located on different floors.

Osborne also conceded that the staff of the District Attorney General's office frequently drank coffee and conversed together in the mornings. However, he could only recall one occasion on which he overheard staff members discussing the appellant's case. Specifically, one staff member inquired concerning the date of a court hearing in the appellant's case. On that occasion, Osborne immediately departed the room. Osborne assured the court that, should anyone attempt to discuss the appellant's case with him, he would immediately notify the court.

The State next presented the testimony of William C. Whitesell, Jr., the District Attorney General for the Sixteenth Judicial District. Whitesell confirmed that, when he hired Osborne, he discussed with Osborne potential conflicts of interest. Due to these potential conflicts, Whitesell assigned Osborne to prosecute cases in the Rutherford County General Sessions Court rather than in the Rutherford County Circuit Court. Whitesell also directed members of his staff to avoid any discussions with Osborne concerning the appellant's case and other cases in which Osborne had participated as an assistant district public defender or in which the District Public Defender's office had participated during Osborne's employment by that office. Whitesell noted that, in light of the charged offense, "[the appellant's] case was given special attention." Indeed, Whitesell asserted that, to his knowledge, the file in the appellant's case was being kept at a location outside the District Attorney General's office. He assured the court that, should he become aware of any impropriety, he would immediately notify the court. Finally, Whitesell conceded that, notwithstanding the procedures employed by his office, some might perceive an appearance of impropriety in the appellant's case due to Osborne's employment by his office.

Both the State and the appellant stipulated that, were Assistant District Attorney General J. Paul Newman to testify, he would state that he obtained possession of the file in the appellant's case prior to Osborne's employment as an assistant district attorney general. Moreover, Newman would state that, since obtaining possession of the file, he had kept the file at his home with the exception of one occasion on which he brought the file to the office in order to allow the appellant's attorney to view a videotape cassette. Newman assured the court that he intended to keep the file at his home until the appellant's trial.

On December 22, 1998, the trial court denied the appellant's motion to disqualify the entire District Attorney General's office. In its order, the trial court concluded:

> After careful consideration of the motion to disqualify the District Attorney General's office in the prosecution of this case, I find that Mr. Osborne has not participated either directly or indirectly in the Coulter case. Further, I find that the Memorandum of procedure employed by the District Attorney's office has effectively prevented the possibility that confidences of Mr. Coulter would be disclosed by Mr. Osborne to the others in the office intentionally or inadvertently. These affirmative actions overcome any appearance of impropriety.

-16-

Therefore, the Motion is overruled. The District Attorney and his staff are ordered to strictly follow the Memorandum and to have no discussion either directly or indirectly with Mr. Osborne concerning the Coulter case. They are also not to discuss this case in Mr. Osborne's presence. Mr. Osborne is ordered to continue protecting the confidence of Mr. Coulter as he has in the past. If it comes to the attention of the Defendant that this order has been violated they may raise this issue again with any supporting proof.

I find that the original order appointing Mr. Scarlett is to be amended to reflect that his appointment was an accommodation to the District Public Defender's office and to dispel any potential appearances of impropriety. I find that no actual conflict exist[ed] for that office to continue in the representation of Mr. Coulter.

### 2. Analysis

In reviewing the trial court's denial of the appellant's motion, we initially note that improper or unethical participation by a prosecutor or a prosecutor's office in a criminal case may implicate the basic constitutional rights of a defendant, "the orderly administration of justice, the dignity of the courts, the honor and trustworthiness of the legal profession[,] and the interests of the public at large." State v. Phillips, 672 S.W.2d 427, 435 (Tenn. Crim. App. 1984); see also State v. Willie Claybrook, No. 3, 1992 WL 17546, at *8 (Tenn. Crim. App. at Jackson, February 5, 1992). In protecting these concerns, Tennessee courts generally turn for guidance to our Code of Professional Responsibility, as adopted by our supreme court in Tenn. Sup. Ct. Rule 8, and to court-created principles of professional conduct. State v. Ricky Raymond Bryan, No. M1999-00854-CCA-R9-CD, 2000 WL 1131890, at **3-8 (Tenn. Crim. App. at Nashville, August 4, 2000). A trial court's application of these legal standards to a disqualification motion will not be disturbed on appeal absent an abuse of discretion. State v. Culbreath, 30 S.W.3d 309, 313 (Tenn. 2000); State v. Tate, 925 S.W.2d 548, 549-550 (Tenn. Crim. App. 1995); John M. Clinard v. C. Roger Blackwood, No. M1998-00555-SC-R11-CV, 2001 WL 530834, at *1 (Tenn. at Nashville, May 18, 2001); State v. Steve Mason, No. 01C01-9603-CC-00103, 1997 WL 311900, at *6 (Tenn. Crim. App. at Nashville, June 6, 1997); Claybrook, No. 3, 1992 WL 17546, at *12. An abuse of discretion might comprise the application of an incorrect legal standard or a decision that is against logic or reasoning and that caused an injustice to the complaining party. State v. Shirley, 6 S.W.3d 243, 247 (Tenn. 1999); State v. Shuck, 953 S.W.2d 662, 669 (Tenn. 1997). In determining whether the trial court has applied an incorrect legal standard, "'appellate courts are not required to defer to a trial court's interpretation of the Code of Professional Responsibility or to its decisions regarding legal standards applicable to a particular disqualification motion.'" Bryan, No. M1999-00854-CCA-R9-CD, 2000 WL 1131890, at *2; cf. Clinard, No. M1998-00555-SC-R11-CV, 2001 WL 530834, at *2.

For purposes of deciding whether a prosecutor or his office should be disqualified from participation in a criminal case, this court and our supreme court have adopted the following analytical framework: (1) Do the circumstances of the defendant's case establish an actual conflict

-17-

of interest that requires the disqualification of a prosecutor? (2) Do the circumstances of the defendant's case create an appearance of impropriety that requires the disqualification of a prosecutor? (3) If either theory requires the disqualification of a prosecutor, is the entire District Attorney General's office likewise disqualified? Culbreath, 30 S.W.3d at 312-313; Tate, 925 S.W.2d at 550; Mason, No. 01C01-9603-CC-00103, 1997 WL 311900, at *6.

In this case, it is obvious that an actual conflict of interest required Osborne's disqualification from any participation in the appellant's case. Reviewing the applicable legal standards, Tenn. Sup. Ct. Rule 8, EC 5-1 states that "[t]he professional judgment of a lawyer should be exercised, within the bounds of the law, solely for the benefit of the client and free of compromising interests and loyalties." Citing this ethical consideration, our supreme court has observed in turn that "an actual conflict of interest . . . includes any circumstances in which an attorney cannot exercise his or her independent professional judgment free of 'compromising interests and loyalties.'" Culbreath, 30 S.W.3d at 312. Accordingly, Tenn. Sup. Ct. Rule 8, DR 5-105(A) prohibits a lawyer from accepting proffered employment "if it would be likely to involve the lawyer in representing differing interests." DR 5-105 does not expressly address an attorney's successive (as opposed to simultaneous or multiple) representation of differing interests. Cf. Tennessee Rules of Professional Conduct 1.9, 1.11 (Proposed Official Draft 2000). Nevertheless, it is clear that actual conflicts of interest may arise in cases involving successive representation. See, e.g., Clinard, No. M1998-00555-SC-R11-CV, 2001 WL 530834, at **1-3; State v. Frank A. Hoggett, No. 01C01-9003-CR-00073, 1990 WL 172632, at *1 (Tenn. Crim. App. at Nashville, November 9, 1990); William R. Mills v. Donald E. Crane, No. 66, 1987 WL 9165, at **4-5 (Tenn. App. at Knoxville, April 10, 1987). Moreover, it is clear that one of the primary concerns in such cases is the possibility that the attorney may use or divulge on behalf of the new client confidential or privileged information obtained from the former client. See Tenn. Sup. Ct. R. 8, DR 4-101.

Indeed, broadly speaking, "a lawyer may not represent interests materially adverse to those of a former client if the subject matter of the new representation is substantially related to the subject matter of the previous representation." John M. Clinard v. C. Roger Blackwood, No. 01A01-9801-CV-00029, 1999 WL 976582, at *7 (Tenn. App. at Nashville, October 28, 1999), affirmed by Clinard, No. M1998-00555-SC-R11-CV, 2001 WL 530834, at *8. Under those circumstances, a presumption arises that the attorney received confidential or privileged information during his prior representation, raising the specter that the attorney will use or divulge the information on behalf of the new client. Mills, No. 66, 1987 WL 9165, at *5. Of course, in this case, it was undisputed that Osborne both had previously represented the appellant in the pending prosecution and had received his confidences. As this court has previously observed,

> "[w]hen an attorney has once been engaged and received the confidences of his client, he cannot enter the services of those whose interests are adverse to that of his client or former client. . . . [Thus,] [a]n attorney cannot be permitted to participate in the prosecution of a criminal case if, by reason of his professional relation with the accused, he has acquired knowledge of facts upon which the prosecution is predicated, or which are closely interwoven therewith."

-18-

Phillips, 672 S.W.2d at 430-431 (quoting Autry v. State, 430 S.W.2d 808, 809 (Tenn. Crim. App. 1967)); see also Tate, 925 S.W.2d at 553; State v. Locust, 914 S.W.2d 554, 557 (Tenn. Crim. App. 1995); Mattress, 564 S.W.2d at 680; Claybrook, No. 3, 1992 WL 17546, at *7. In short, having defended the appellant in this case and received his confidences, Osborne could not then "switch sides" and represent the State in prosecuting the appellant.

We turn then to the primary issue in this appeal, namely whether Osborne's disqualification due to an actual conflict of interest likewise required the disqualification of the entire District Attorney General's office. As noted by our supreme court in Clinard, No. M1998-00555-SC-R11-CV, 2001 WL 530834, at **2-3, Tenn. Sup. Ct. Rule 8, DR 5-105(D) provides:

> If a lawyer is required to decline employment or to withdraw from
> employment under a Disciplinary Rule, no partner, or associate, or
> any other lawyer affiliated with that lawyer or that lawyer's firm may
> accept or continue such employment.

However, the court in Clinard, No. M1998-00555-SC-R11-CV, 2001 WL 530834, at *3 (footnote omitted), also affirmed that, "[i]n these days of monolithic law firms and increased opportunity and mobility for both clients and attorneys, a per se rule of vicarious disqualification is not feasible." Accordingly, as an exception to the DR 5-105(D) rule of vicarious disqualification, the court adopted the case-by-case analysis employed by the United States Court of Appeals for the Seventh Circuit in Schiessle v. Stephens, 717 F.2d 417, 420 (7th Cir. 1983), in determining whether an attorney's prior representation mandates vicarious disqualification. Clinard, No. M1998-00555-SC-R11-CV, 2001 WL 530834, at **3-4; see also See also Board of Professional Responsibility of the Supreme Court of Tennessee, Formal Ethics Op. No. 89-F-118, 1989 WL 534365, at **2-3 (March 10, 1989).

Having already determined that Osborne previously represented the appellant in the pending prosecution and that Osborne received the confidences of the appellant during the former representation, we have resolved the first two inquiries of the Schiessle analysis. Clinard, No. M1998-00555-SC-R11-CV, 2001 WL 530834, at *4. Moreover, once a defendant has established a substantial relationship between the pending prosecution and the matter in which the attorney was previously representing the defendant, there arises a presumption that the attorney shared confidential or privileged information with his new associates in the District Attorney General's office. Id.; see also Tate, 925 S.W.2d at 557; Claybrook, No. 3, 1992 WL 17546, at *11. In order to rebut this presumption of shared confidences, the prosecution carries the burden of establishing by clear and convincing evidence that appropriate screening measures have been undertaken to insulate the "infected" attorney from the ongoing prosecution. Clinard, No. M1998-00555-SC-R11-CV, 2001 WL 530834, at *4; see also Tate, 925 S.W.2d at 557-558; Claybrook, No. 3, 1992 WL 17546, at *11; cf. Tennessee Rules of Professional Conduct 1.10(c) (Proposed Official Draft 2000).

Thus, any determination of whether a prosecutor's disqualification must be imputed to the entire District Attorney General's office depends upon a case-by-case evaluation of the screening mechanisms employed. Clinard, No. M1998-00555-SC-R11-CV, 2001 WL 530834, at **4-5; see also Board of Professional Responsibility of the Supreme Court of Tennessee, Formal Ethics Op. No. 87-F-111, 1987 WL 364065, at *2 (Sept. 16, 1987). The supreme court in Clinard,

No. M1998-00555-SC-R11-CV, 2001 WL 530834, at *4, set forth a non-exclusive list of factors relevant to a court's evaluation:

> 1) the structural organization of the law firm or office involved,
> 2) the likelihood of contact between the "infected" person and the specific attorneys and support personnel involved in the present representation,
> 3) the existence of law firm or office rules which prevent the "infected" person
>> a) from access to relevant files or other information pertaining to the present litigation and
>> b) from sharing in the fees derived from such litigation.

See also Bryan, No. M1999-00854-CCA-R9-CD, 2000 WL 1131890, at *3 n.2; Claybrook, No. 3, 1992 WL 17546, at *10-12. In weighing the above factors, the question to be asked is "'whether the screening mechanisms reduce to an acceptable level the potential for prejudicial misuse of client confidences.'" Clinard, No. M1998-00555-SC-R11-CV, 2001 WL 530834, at *4; see also Claybrook, No. 3, 1992 WL 17546, at *10. Viewing the particular facts of the instant case in light of the above factors, we conclude that the State adequately rebutted the presumption that Osborne shared the appellant's confidences with other staff members of the District Attorney General's office.

Notwithstanding our conclusion, the supreme court in Clinard, No. M1998-00555-SC-R11-CV, 2001 WL 530834, at **6-7, further held that an appearance of impropriety may require vicarious disqualification even if the disqualified attorney and his associates employ adequate screening mechanisms. The court cited the ethical consideration set forth in Tenn. Sup. Ct. Rule 8, EC 9-6 that "[e]very lawyer owes a solemn duty to . . . avoid not only professional impropriety but also the appearance of impropriety." The court then identified the following "subtle, but identifiable, contours" of the appearance of impropriety standard. Clinard, No. M1998-00555-SC-R11-CV, 2001 WL 530834, at *6. First, the mere possibility of impropriety is insufficient to warrant disqualification. Id. Second, "objective public perception rather than the subjective and 'anxious' perceptions of litigants governs." Id. Third, the existence of an appearance of impropriety is to be determined from the perspective of a reasonable lay person. Id. at 7. Fourth and finally, the reasonable lay person is deemed to have been informed of all the facts, including whether and to the extent screening mechanisms were employed. Id.

We note that the court in Clinard, No. M1998-00555-SC-R11-CV, 2001 WL 530834, at *7, was addressing factual circumstances in which a private firm "st[ood] as adversary" to an associate's former clients in the same litigation in which the associate had previously represented the clients and gained their confidences. Applying the above appearance of impropriety standard, the court concluded that the firm must be disqualified despite its employment of adequate screening mechanisms. Id. at 8. In reaching its conclusion, the court remarked:

> To analogize to baseball, [the associate] has not only switched teams, he has switched teams in the middle of the game after learning the

signals. That [he] has been benched by his new team does little to
ameliorate the public perception of an unfair game.

Id. at *7.

As in Clinard, Osborne "switched teams in the middle of the game after learning the signals." Id. Nevertheless, we believe it to be significant that the supreme court arrived at its conclusion in Clinard in the context of an attorney moving between private firms and in the context of civil proceedings. Therefore, the supreme court did not address the court of appeals' observation below that Tennessee's intermediate appellate courts have taken different paths with regard to imputed disqualification and the efficacy of screening mechanisms. Clinard, No. 01A01-9801-CV-00029, 1999 WL 976582, at *16. The court of appeals remarked:

> This difference can be explained, at least in part, by the distinction
> between lawyers in government service and those in private practice
> and by the difference between criminal proceedings and civil
> proceedings. The cases reflect an understanding that applying the
> imputed disqualification doctrine to district attorney generals' offices
> in the same way that it is applied to private law firms would seriously
> hamper the prosecution of criminal cases.

Id. Correspondingly, this court recently observed in Bryan, No. M1999-00854-CCA-R9-CD, 2000 WL 1131890, at *6 (quoting United States v. Caggiano, 660 F.2d 184, 191 (6th Cir. 1981)), that

> [p]rivate and public practice have significant distinctions, such that
> screening procedures for attorneys in government service are
> generally viewed with less skepticism: "The relationships among
> lawyers within a government agency are different from those among
> partners and associates of a law firm. The salaried government
> employee does not have the financial interest in the success of
> departmental representation that is inherent in private practice."

See also Tate, 925 S.W.2d at 556-557; Claybrook, 1992 WL 17546, at **9-10. Moreover, in Claybrook, No. 3, 1992 WL 17546, at *9 (quoting ABA Comm. on Ethics and Prof'l Responsibility, Formal Op. 342 (1976)), we noted "'[t]he important difference in the adversary posture of the government lawyer . . . recognized [in] Canon 7.'" See Tenn. Sup. Ct. Rule 8, EC 7-13.

Thus, this court has repeatedly observed that a *prosecutor's* disqualification need not be imputed to the "entire district attorney general's office . . . so long as the attorney at issue does not disclose confidences or otherwise participate in the prosecution." Tate, 925 S.W.2d at 556; see also Mattress, 564 S.W.2d at 680; Mason, No. 01C01-9603-CC-00103, 1997 WL 311900, at *6; State v. Robert West, No. 01C01-9107-CC-00202, 1992 WL 62020, at **2-3 (Tenn. Crim. App. at Nashville, March 31, 1992). In other words, "[e]arly and adequate screening in the case of actual conflict or the appearance of impropriety should usually resolve [the] problem." Tate, 925 S.W.2d at 556. We have followed this principle even when a disqualified prosecutor was previously a member of the defense "team." For example, in Mason, No. 01C01-9603-CC-00103, 1997 WL 311900, at **5-6, under factual circumstances substantially identical to those in the instant case, we declined to hold that an attorney's "mere presence in the District Attorney[] [General's] office while

-21-

in possession of privileged, confidential information pertaining to [the] appellant warranted disqualification of the entire office" from prosecuting the appellant's case. See also West, No. 01C01-9107-CC-00202, 1992 WL 62020, at **2-3. In sum, the trial court in this case did not abuse its discretion in concluding that the screening mechanisms employed by the District Attorney General's office forestalled any actual or apparent impropriety.

In reaching our conclusion, we reiterate that, when an accused's attorney joins the prosecution, "[t]he potential for disclosure, inadvertent or otherwise, by the . . . attorney of a criminally accused's confidences and secrets threatens the foundation of the accused's constitutional rights," including his privilege against self-incrimination, his right to the effective assistance of counsel, and his right to a fair and impartial trial and due process of law. Claybrook, No. 3, 1992 WL 17546, at *11. In this regard, however, "the appearance of impropriety is not the central concern. Primarily, it is a matter of an unacceptable risk of harm or disclosure which is at issue." Id.; see also Tate, 925 S.W.2d at 557. The screening mechanisms employed by the District Attorney General's office in this case adequately addressed this "central concern." This issue is without merit.

### b.    Fourth and Fifth Amendment Claims

The appellant next challenges the trial court's denial of his pre-trial motions to suppress both his "statement" to officers of the La Vergne Police Department on December 3, 1997, and the "fruits" of the warrantless search of his home conducted by police officers on the same day. The appellant asserts that the officers violated his rights under the Fourth and Fifth Amendments to the United States Constitution.

### 1.    Trial Court Proceedings

The appellant filed his motions to suppress on February 22, 1999, and the trial court conducted an evidentiary hearing on the appellant's motions on February 26, 1999. At the suppression hearing, as at trial, the State established that the appellant appeared in the lobby of the La Vergne Police Department on the evening of December 3, 1997. Officer Lowery approached the appellant and asked if she could assist him, whereupon he informed her that he had "just killed his wife." Lowery immediately retreated to the dispatchers' office, radioed her sergeant, and asked that he come to the station. She then reemerged from the office and asked the appellant to seat himself on a bench in the lobby, indicating that another officer would soon be available to speak with him. While the appellant was waiting on the bench, Lowery obtained from him his home address and dispatched an officer to that address.

Almost immediately thereafter, Officer Thompson arrived at the police station and approached the appellant. Thompson asked the appellant "what had happened." When the appellant responded that he had killed his wife, Thompson briefly searched the appellant for weapons and handcuffed the appellant. Afterwards, "[t]here was some communication in reference to the address which [the appellant] had reported." Ultimately, the appellant offered to guide Thompson to his home.

-22-

Accordingly, Thompson escorted the appellant to a patrol car and placed him in the prisoner compartment of the vehicle. Thompson testified at the suppression hearing that the prisoner compartment of the vehicle is separated from the front seats by a "shield." The upper portion of the shield consists of "Lexan," and the lower portion consists of "a stainless steel metal material." Nevertheless, Thompson stated that, as he began to drive toward the appellant's home, he overheard the appellant begin "making some statements . . . [that the appellant] couldn't believe he [had] killed [his wife]." Thompson immediately interrupted the appellant and provided a <u>Miranda</u> warning.

Before conveying to the appellant the requisite litany of constitutional rights, Thompson obtained confirmation from the appellant that he could hear Thompson through the "shield" and also that he "spoke, wrote, read, and understood English" and did not suffer from "any medical problems that would impair him from understanding [Thompson]." Thompson then informed the appellant

> that he had the right to remain silent, that if he gave up the right to remain silent, anything that he said would be used against him in court. He had the right to talk to a lawyer for advice before he said anything or I asked him any questions. If he couldn't afford to hire a lawyer, one would be appointed for him without cost to him, if he wished one. He also had the right to stop answering any questions at any time in order to talk to a lawyer.

After informing the appellant of his constitutional rights, Thompson inquired if the appellant understood his rights. The appellant responded affirmatively. According to Thompson, the patrol car's siren was not activated during the provision of the <u>Miranda</u> warning.

Following the above exchange, Thompson obtained from the appellant more detailed directions to the appellant's mobile home, arriving at the mobile home at approximately 6:52 p.m. Almost simultaneously, Corporal Mark Sloan, another officer of the La Vergne Police Department, arrived at the Coulters' home. The appellant directed both officers to an unlocked door, and the officers entered the mobile home, loudly announcing their presence. Thompson testified at the suppression hearing that his "most immediate concern" was determining whether anyone inside the Coulters' home required medical assistance. Thompson especially feared that Ms. Coulter might be "alive and dying." Additionally, Sloan was familiar with the Coulter family and indicated to Thompson that a child might be present inside the home.

Upon entering the Coulters' home, the officers initially found themselves inside the living room. Thompson also observed a "little kitchenette" to the left of the living room. A gun was lying on a table in the kitchenette. No one responded to the officers' repeated calls, and the officers quickly determined that no one was present in either the living room or the kitchenette. Continuing their search, they entered a hallway that appeared to lead to additional rooms. In the hallway, the officers opened the first door that they encountered, revealing a darkened room. When Thompson turned on the lights in the room, the officers observed Ms. Coulter's body lying on a bed and "a considerable amount of blood about the bed, spattered on the wall."

Sloan briefly examined Ms. Coulter, confirming that she was dead. Thereafter, Sloan remained inside Ms. Coulter's room, while Thompson returned to the living room and notified both the police station and the "Rutherford County EMS coroner" about the discovery of Ms. Coulter's body. Thompson also went outside and erected a barrier around the mobile home using crime scene tape. Finally, at approximately 7:00 p.m., Thompson returned with the appellant to the police station. At the suppression hearing, Thompson confirmed that, to his knowledge, the police did not have a warrant to search the appellant's home on December 3, 1997.

At approximately 7:07 p.m. on the same night, Detective Watson arrived at the Coulters' home, where he encountered Sloan and two additional officers. Watson immediately entered the mobile home, viewed Ms. Coulter's body, and began collecting evidence. Watson recalled at the evidentiary hearing that, overall, he was at the crime scene for "close to an hour." During this time, Sergeant Hollins also arrived at the appellant's home, and Hollins and Sloan photographed the crime scene. Like Thompson, Watson testified at the suppression hearing that, to his knowledge, the police never obtained a warrant to search the Coulters' mobile home on December 3, 1997. Watson conceded that he could have obtained a warrant.

The evidence collected by Watson on the night of the murder included the gun found on the kitchen table, a purse found on the floor of Ms. Coulter's bedroom, and the sheets, pillows, and pillowcases located on Ms. Coulter's bed. Additionally, as later indicated at trial, Ms. Coulter's body was moved, uncovering a bullet hole in Ms. Coulter's mattress. Upon further investigation, Watson and Sloan discovered a spent bullet "under the mattress in the springs."

Meanwhile, at the police station, Thompson "booked" the appellant into the jail. During booking procedures, Thompson asked the appellant if he wished to make a telephone call, but the appellant refused Thompson's offer. Thompson also read to the appellant an "admonition and waiver of rights" form. The appellant confirmed that he understood his rights and, at approximately 7:03 p.m., signed a written waiver of those rights.

Thompson testified at the suppression hearing that, following the appellant's waiver of his rights, the officer

> entered into some conversation [with the appellant] about [the appellant's] background, where he was from, some personal things, date of birth, what kind of work he did, what kind of illnesses he had had in his life, any medications, if any, that he was taking at the time.

According to Thompson, the appellant recounted that he had previously been employed in the aircraft industry and had sustained injuries during an accident at his workplace. However, the appellant assured Thompson that he "was okay now."

Subsequently, Sergeant Hollins arrived at the police station. Hollins introduced himself to the appellant and obtained permission from the appellant to conduct an audio taped interview of the appellant. The interview commenced at 8:35 p.m., approximately one and one-half

hours after the appellant's waiver of his Miranda rights, and concluded at approximately 9:08 p.m. Both Hollins and Thompson participated in questioning the appellant.

Following the State's presentation of evidence at the suppression hearing, defense counsel argued in support of the appellant's motions to suppress. With respect to the appellant's motion to suppress "the statement he gave to members of the Lavergne Police Department on or about December 3, 1997," defense counsel solely addressed statements made by the appellant to Hollins and Thompson during the audio taped interview. Essentially, counsel asserted that the appellant did not knowingly and voluntarily waive his Miranda rights before agreeing to participate in the audio taped interview.

As to the appellant's motion to suppress "the fruits of the search of his home on or about December 3, 1997," defense counsel conceded that Thompson and Sloan could enter the Coulters' mobile home without a warrant for the purpose of determining Ms. Coulter's medical condition and for the purpose of determining "if anyone else was lurking around." Moreover, the appellant appeared to concede that the police were entitled to seize anything in plain view of the initial responding officers and only asked that any photographs taken of the crime scene and "anything else they seized that was not in plain view, such as the bullet hole, the fragment, and so forth, . . . be suppressed." With respect to the photographing of the crime scene and the search for and seizure of items outside the plain view of the officers, the appellant asserted that,

> once they determine [Ms. Coulter's] condition and determine that no
> one else is there, they've got to get out, seal the scene, and go get a
> search warrant, which they didn't do.

In passing, the appellant disputed any claim that the appellant consented to a search of his home.

In responding to the appellant's motion to suppress his statement to officers of the La Vergne Police Department, the prosecutor initially noted, "I didn't hear anything about the volunteered statement at the police station, and I assume by that that there's not any opposition to that." Nevertheless, "to be on the safe side," the prosecutor noted that volunteered or spontaneous statements "made under these . . . type of conditions" are admissible. Additionally, the prosecutor asserted that the appellant's later waiver of his Miranda rights at the police station was knowing and voluntary, emphasizing Thompson's provision of the Miranda warning to the appellant on two separate occasions.

In response to the appellant's motion to suppress evidence obtained pursuant to the December 3, 1997 warrantless search, the prosecutor asserted that the officers' entry into and search of the appellant's mobile home were justified by exigent circumstances. Moreover, the prosecutor argued that the ensuing seizures of evidence were encompassed by the plain view doctrine. Alternatively, he noted that the police would inevitably have discovered the seized items.

At the conclusion of the suppression hearing, the trial court first denied the appellant's motion to suppress his statement to officers of the La Vergne Police Department. Like the prosecutor, the trial court preliminarily noted that "the Defendant in this case present[ed] himself

voluntarily at the police station declaring that he in fact ha[d] . . . just killed [his] wife. . . . [T]here's no requirement that you stop somebody from making a voluntary statement. That's clearly a voluntary statement." In this regard, the trial court additionally noted that the appellant volunteered statements while confined in the prisoner compartment of Thompson's patrol car, presumably referring to the appellant's remark of disbelief that he had killed his wife. Finally, like the prosecutor, the trial court noted that Thompson subsequently provided <u>Miranda</u> warnings to the appellant on two separate occasions. Accordingly, the trial court concluded that the appellant participated in the audio taped interview at the La Vergne Police Department "freely and knowingly . . . after a waiver of the right to remain silent under the Fifth Amendment as applicable by the Fourteenth Amendment to the state."

As to the appellant's motion to suppress evidence obtained pursuant to the warrantless search of his home, the trial court concluded:

> [C]learly there are exigent circumstances here that allow the police to enter this residence. I can't think of anything more exigent than to be presented with a situation where you are now knowledgeable that someone has been shot, in the view of the person who has said that, they believe that they've killed them. And the police certainly need to get to that scene to check out the condition of that person and to render aid or provide aid to them if they have not expired. So, certainly, exigency exists to get them there.
>
> In addition, in this case Mr. Coulter, he's cooperating. He's directing them to the place where this particular victim is located. He's telling them how to get in, in effect, consenting to the entry. And once inside into this inquiry, the police are observant of the weapon in plain view. They have a right to seize that.
>
> And in processing this body, trying to move it, they certainly are entitled to seize what is immediately in their plain view there that depicts how this occurred, this death occurred. And I find nothing is out of the ordinary about that.
>
> . . . [T]he exigencies of the potential harm to the wife certainly gives rise to them processing what is right in front of them and taking the pillow, the sheets, the projectile.

## 2. Analysis
### A. Standard of Review
In <u>State v. Odom</u>, 928 S.W.2d 18, 23 (Tenn. 1996), our supreme court clarified that a trial court's findings of fact following a suppression hearing are conclusive on appeal unless the evidence contained in the record preponderates otherwise. In this regard, the court observed:

> Questions of credibility of the witnesses, the weight and value of the evidence, and resolution of conflicts in the evidence are matters entrusted to the trial judge as the trier of fact. The party prevailing in the trial court is [therefore] entitled to the strongest legitimate view of the evidence adduced at the suppression hearing as well as all reasonable and legitimate inferences that may be drawn from that evidence.

Id. More recently, in State v. Walton, 41 S.W.3d 75, 81 n.3 (Tenn. 2001), the court reaffirmed that "the standard of appellate review for findings of fact at a suppression hearing is that articulated by this Court in Odom." Of course, an appellate court's review of the trial court's factual findings is not limited to evidence submitted at the suppression hearing but encompasses the entire record of proceedings, including evidence submitted at trial. State v. Henning, 975 S.W.2d 290, 299 (Tenn. 1998). Moreover, an appellate court will review de novo the trial court's application of the law to factual findings. State v. Crutcher, 989 S.W.2d 295, 299 (Tenn. 1999).

### B.    Appellant's Statements to Officers of the La Vergne Police Department

In his brief on appeal, the appellant challenges the admissibility of statements that he made to Officer Thompson in the lobby of the La Vergne Police Department and en route to the appellant's home prior to the discovery of Ms. Coulter's body. In particular, the appellant focuses his complaint upon statements that he made in response to Thompson's questioning and that concerned his commission of this offense, the location of Ms. Coulter's body, and his address. The appellant asserts that, in eliciting these statements, Thompson failed to comply with the procedures set forth by the United States Supreme Court in Miranda v. Arizona, 384 U.S. 436, 86 S. Ct. 1602 (1966), procedures intended to safeguard the privilege against compulsory self-incrimination contained in the Fifth and Fourteenth Amendments to the United States Constitution. The State responds that the appellant's initial statements to Thompson "were voluntary and did not require Miranda warnings." We simply conclude that, because the appellant failed to challenge in the trial court the statements at issue in this appeal, he has waived this issue.

Tenn. R. Crim. P. 12(b)(3) provides that motions to suppress evidence must be raised prior to trial. "The rule is applicable when a claim of a constitutional right is involved whose violation would lead to suppression of evidence." State v. Goss, 995 S.W.2d 617, 628 (Tenn. Crim. App. 1998). Moreover, like other motions, a motion to suppress is governed by Tenn. R. Crim. P. 47. State v. Bell, 832 S.W.2d 583, 588 (Tenn. Crim. App. 1991); State v. Burton, 751 S.W.2d 440, 445 (Tenn. Crim. App. 1988). Tenn. R. Crim. P. 47 provides:

> A motion other than one made during a trial or hearing shall be in writing unless the court permits it to be made orally. *It shall state with particularity the grounds upon which it is made and shall set forth the relief or order sought.*

(Emphasis added).

In this case, the appellant filed a written motion prior to trial that sought

> to suppress the statement he gave to members of the Lavergne Police Department on or about December 3, 1997. As grounds therefore [he] would state and show unto the Court he was not adequately advised of his rights or the waiving of the same and would further show he did not waive his right to counsel prior to questioning.

Because the appellant made several statements to officers of the La Vergne Police Department on December 3, 1997, the appellant's motion does not clearly set forth the relief sought. Nevertheless, as previously noted, the appellant clarified at the suppression hearing that his complaint lay in the introduction into evidence at his trial of his audio taped statements to Thompson and Hollins. At no time during the suppression hearing did the appellant challenge the introduction into evidence of his initial statements to Thompson in the lobby of the La Vergne Police Department and en route to the Coulters' mobile home. Again, the State did raise the admissibility of the appellant's "volunteered statement at the police station," seemingly referring to the appellant's initial statement to Lowery that he had killed his wife. The trial court's ruling largely conformed to the arguments of counsel. In other words, the trial court addressed the appellant's motion to suppress as presented, and its ruling did not reach the statements at issue in this appeal. Bell, 832 S.W.2d at 588-589.

Of course, a trial court may address a motion to suppress at a later juncture in the proceedings "for cause shown." Tenn. R. Crim. P. 12(f); see also Bell, 832 S.W.2d at 589. However, the appellant in this case also failed to challenge the admissibility of his initial statements to Thompson either during the trial itself or in his motion for new trial. Tenn. R. App. P. 3(e) & 36(a); see also State v. Alvin B. Tate, No. W1999-01224-CCA-R3-CD, 2000 WL 791807, at *2 (Tenn. Crim. App. at Jackson, June 16, 2000). In sum, "[a] trial court cannot be held in error when it was not given an opportunity to rule on the issue raised [on appeal]." State v. Walker, 910 S.W.2d 381, 396 (Tenn. 1995).

Additionally, notwithstanding the appellant's statement of the issue and his accompanying argument, it is unlikely that the appellant's complaint on appeal lies purely in the admission at his trial of his initial statements to Thompson. Otherwise, even if worthy of merit, the appellant's complaint would afford him no relief. In other words, the admission of the appellant's initial statements to Thompson would be harmless error in light of other, overwhelming evidence admitted at the appellant's trial, including the audio cassette recording of the appellant's interview with Thompson and Hollins. Chapman v. California, 386 U.S. 18, 24, 87 S. Ct. 824, 828 (1967). Indeed, the appellant suggests in his brief that his complaint actually lies in the admission at his trial of physical evidence discovered as a consequence of his initial statements to Thompson. Specifically, the appellant observes, "The knowledge of the defendant's address and other pertinent information concerning the defendant was obtained by Sergeant Thompson during the initial custodial interrogation of the defendant prior to Miranda warnings. . . . The[] [appellant's] statements led to the discovery of the victim and to the warrantless search that was performed by the LaVergne Police Department."

Of course, the appellant's failure to challenge in the trial court the admissibility of his initial statements to Thompson necessarily led to his failure to invoke the "fruit-of-the-poisonous-

tree" doctrine in favor of suppressing physical evidence obtained as a consequence of those statements. Moreover, to the extent that he has attempted to invoke the doctrine on appeal, his statement of the issue and his argument are inadequate. Tenn. R. App. P. 27(a)(4) & (7); Tenn. Ct. of Crim. App. Rule 10(b). In any event, interpreting both the federal and state constitutions, our supreme court recently concluded that

> a *per se* exclusionary rule, which would automatically exclude non-testimonial evidence obtained from a technical failure to give <u>Miranda</u> warnings, is not warranted. Instead, we hold that a defendant may seek suppression of non-testimonial evidence discovered through his or her unwarned statements only when the statements are the product of an actual violation of the privilege against self-incrimination, i.e., such as when actual coercion in obtaining the statement is involved or when the invocation of the right to remain silent or to have counsel present is not "scrupulously honored."

<u>Walton</u>, 41 S.W.3d at 92. The appellant in this case does not allege "an actual violation of the privilege against self-incrimination" within the meaning of <u>Walton</u>. Thus, without even addressing the potential applications of the independent source and inevitable discovery doctrines, we can conclude that the exclusionary rule would not extend to non-testimonial evidence obtained as a consequence of the appellant's initial statements to Thompson.

Finally, we note in passing that the appellant also failed to invoke in the trial court the "fruit-of-the-poisonous-tree" doctrine in favor of suppressing the appellant's audio taped statements to Thompson and Hollins. Indeed, the appellant does not claim in his brief on appeal that his audio taped statements to Thompson and Hollins were the "fruit" of his earlier statements to Thompson or otherwise challenge the introduction into evidence at his trial of the audio taped statements. Tenn. R. App. P. 27(a)(4) & (7); Tenn. Ct. of Crim. App. Rule 10(b).[1] This issue is without merit.

### C.      Warrantless Search of Coulters' Mobile Home

The appellant also challenges the admissibility at his trial of the "fruits" of the warrantless search of his home conducted by officers of the La Vergne Police Department on December 3, 1997. As in the trial court, the appellant effectively concedes on appeal that Officer Thompson and Corporal Sloan could lawfully enter his home on December 3, 1997, in order to ascertain Ms. Coulter's medical condition. However, he asserts that any subsequent search of his home and the photographing and seizure of evidence found therein required a warrant under the Fourth and Fourteenth Amendments to the United States Constitution. Again, the State responds that exigent circumstances justified the officers' entry into the appellant's home and their ensuing search for Ms. Coulter. Moreover, the State asserts that, "[o]nce inside, officers were entitled to

---

[1] Significantly, moreover, the appellant relies solely upon federal constitutional protections in challenging the trial court's denial of his motion to suppress. Cf. <u>Oregon v. Elstad</u>, 470 U.S. 298, 309, 105 S. Ct. 1285, 1293 (1985), and <u>Walton</u>, 41 S.W.3d at 91-92.

seize any evidence in plain view." Following careful consideration of this issue, we conclude that the appellant is not entitled to relief.

Preliminarily, we reiterate that, when a defendant files a pre-trial motion to suppress pursuant to Tenn. R. Crim. P. 12(b)(3), it is the defendant's obligation to identify the relief sought and the grounds therefor. Tenn. R. Crim. P. 47. Moreover, at the suppression hearing, "the defendant ha[s] the burden of going forward with the evidence, at least to the extent of identifying the items he [seeks] to suppress, [although] the ultimate burden of proof for a warrantless search is on the prosecution." State v. Johnson, 705 S.W.2d 681, 683 (Tenn. Crim. App. 1985); see also Burton, 751 S.W.2d at 445. In his written motion, the appellant broadly sought to suppress

the fruits of the search of his home on or about December 3, 1997. As grounds therefore defendant would state and show unto the Court his residence was searched without a search warrant and no exigent circumstances were present justifying the search without a warrant.

At the suppression hearing, the appellant more specifically identified the items he sought to suppress. We note, however, that the appellant's identification of objectionable evidence at the suppression hearing differs from his identification of objectionable evidence on appeal.

On appeal, the appellant asserts in his brief that "[t]he fruits of the warrantless search included the [murder] weapon, sheets, pillowcases, bullet fragments, photographs and diagrams all of which were submitted to the jury as evidence and which greatly prejudiced the [appellant]." Yet, as noted previously, the appellant only objected at the suppression hearing to the introduction into evidence of photographs taken of the crime scene during the challenged search and "anything . . . [the police] seized that was not in plain view, such as the bullet hole, the fragment, and so forth." Although not entirely clear from the record, the appellant did not appear to be challenging in the trial court the introduction into evidence of the murder weapon found on the Coulters' kitchen table or of the sheets, pillows, and pillowcases found on Ms. Coulter's bed.[2] Similarly, at no time during the suppression hearing, during trial, or in his motion for new trial did the appellant object to the State's introduction into evidence of any "diagrams" or otherwise identify any diagrams as the fruit of the challenged search. The record does reflect that the State introduced into evidence at the appellant's trial a diagram of the Coulters' mobile home. However, the record does not reflect the source of this diagram.

For purposes of clarity, we also note that, in fact, the State did not introduce into evidence at the appellant's trial the sheets, pillows, or pillowcases seized from Ms. Coulter's bed on December 3, 1997. Again, Detective Watson testified at trial that the La Vergne Police Department lost the pillows and pillowcases during the course of the murder investigation. Nevertheless, the State did introduce into evidence Sergeant Hollins' photographs of the murder scene, which depicted

---

[2]Indeed, in addition to his Fourth Amendment claim, the appellant argued at the suppression hearing that any relevance of the crime scene photographs that depicted Ms. Coulter's body lying on her bed was substantially outweighed by the potential for unfair prejudice because the State had "the pillows and the sheets. They can bring those in and show us."

these lost items of evidence in addition to Ms. Coulter's body, and testimony concerning the seizure of these items from the Coulters' mobile home. Moreover, we assume that the appellant's reference to "bullet fragments" is a reference to the spent bullet recovered from Ms. Coulter's bed.[3] The State did not introduce this spent bullet into evidence at the appellant's trial but did introduce into evidence testimony concerning the bullet, including testimony by Special Agent Carman, the State's firearms identification expert.

> Clearly, in the Fourth Amendment context,
> [t]he exclusionary rule prohibits introduction into evidence of tangible materials seized during an unlawful search and of testimony concerning knowledge acquired during an unlawful search. Beyond that, the exclusionary rule also prohibits the introduction of derivative evidence, both tangible and testimonial, that is the product of the primary evidence, or that is otherwise acquired as an indirect result of the unlawful search.

Murray v. United States, 487 U.S. 533, 536-537, 108 S. Ct. 2529, 2533 (1988)(citations omitted); see also Wong Sun v. United States, 371 U.S. 471, 484-486, 83 S. Ct. 407, 416 (1963); State v. Clark, 844 S.W.2d 597, 600 (Tenn. 1992). However, on appeal, an appellant has an obligation to state in his brief the issue presented for review, the facts relevant to that issue, his contentions with respect to that issue, including the reasons why the contentions require appellate relief, and "the precise relief sought." Tenn. R. App. P. 27(a). In other words, even assuming a Fourth Amendment violation, the appellant must clearly identify objectionable evidence admitted at his trial and explain why the admission of that evidence requires appellate relief. If an appellant declines even to accurately identify the objectionable evidence, he risks the refusal by this court to sift through both the record and the myriad potential applications of the exclusionary rule to determine the scope of relief warranted by a Fourth Amendment violation. Tenn. Ct. of Crim. App. Rule 10(b).

At a minimum, the appellant has waived any objection to the introduction into evidence at his trial of any diagrams and also the murder weapon, sheets, pillows, and pillow cases seized by police on December 3, 1997, or testimony concerning those items. Nevertheless, we note that, with the exception of any diagrams, the trial court did address the admissibility of all the items challenged in this appeal. Accordingly, we will in turn evaluate the correctness of the trial court's determinations.

The Fourth Amendment to the United States Constitution is applicable to the states through the Fourteenth Amendment, Mapp v. Ohio, 367 U.S. 643, 655, 81 S. Ct. 1684, 1691 (1961), and provides that "[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated." A search or seizure is presumptively unreasonable if conducted without a warrant. Mincey v. Arizona, 437 U.S. 385, 390,

---

[3]As already stated, the police additionally recovered a spent bullet from Ms. Coulter's brain. Although the appellant challenged in the trial court and challenges on appeal the State's introduction into evidence of testimony concerning this bullet, the appellant has consistently relied upon grounds other than a Fourth Amendment violation.

98 S. Ct. 2408, 2412 (1978); see also Illinois v. McArthur, 531 U.S. 326, __, 121 S. Ct. 946, 949 (2001); Coolidge v. New Hampshire, 403 U.S. 443, 454-455, 91 S. Ct. 2022, 2032 (1971). However, the State may rebut the presumption if the search or seizure falls within one of several "'specifically established and well-delineated exceptions.'" Mincey, 437 U.S. at 390, 98 S. Ct. at 2412. In other words, "[w]hen faced with special law enforcement needs, diminished expectations of privacy, minimal intrusions, or the like, . . . certain general, or individual, circumstances may render a warrantless search or seizure reasonable." McArthur, 531 U.S. at __, 121 S. Ct. at 949. As earlier indicated, when the State invokes an exception to the warrant requirement in order to justify a search or seizure, the burden rests upon the State to demonstrate that the circumstances of the case lie within the scope of the exception. Coolidge, 403 U.S. at 455, 91 S. Ct. at 2032.

A well-settled exception to the warrant requirement is a search conducted pursuant to consent. Schneckloth v. Bustamonte, 412 U.S. 218, 219, 93 S. Ct. 2041, 2043-2044 (1973); State v. Bartram, 925 S.W.2d 227, 230 (Tenn. 1996). Again, the trial court found that the appellant at least consented to the entry of Thompson and Sloan into his home for the purpose of locating Ms. Coulter. We need not address, however, whether the evidence contained in the record preponderates in favor of this finding, nor need we address the scope of any consent by the appellant. Rather the appellant concedes that the officers' entry into his home was justified by exigent circumstances, and we conclude that the consequent search of the home and the photographing and seizure of evidence found therein were likewise "reasonable."

Notwithstanding the appellant's concession, a review of the law pertinent to warrantless searches in exigent or emergency situations is useful in evaluating the challenged police conduct in this case. As correctly noted by the appellant, the United States Supreme Court in Mincey, 437 U.S. at 395, 98 S. Ct. at 2415, "declined to recognize any special authority in the police to conduct a warrantless investigation at the scene of a possible homicide." 3 WAYNE R. LAFAVE, SEARCH AND SEIZURE § 6.5(e), at 377 (West Publishing Co. ed., 3d ed. 1996); see also Flippo v. West Virginia, 528 U.S. 11, 14, 120 S. Ct. 7, 8 (1999); Thompson v. Louisiana, 469 U.S. 17, 21, 105 S. Ct. 409, 411 (1984)(per curiam). As also acknowledged by the appellant, however, the Court in Mincey did approve warrantless searches in exigent or emergency circumstances. 437 U.S. at 392, 98 S. Ct. at 2413; see also Arizona v. Hicks, 480 U.S. 321, 325-326, 107 S. Ct. 1149, 1153 (1987); State v. Tyler, 598 S.W.2d 798, 801 (Tenn. Crim. App. 1980). Thus, "a warrantless entry by criminal law enforcement officials may be legal when there is compelling need for official action and no time to secure a warrant." Michigan v. Tyler, 436 U.S. 499, 509, 98 S. Ct. 1942, 1949 (1978).

More specifically, the Court in Mincey observed that police may enter a home and conduct a search without a warrant "when they reasonably believe that a person within is in need of immediate aid." 437 U.S. at 392, 98 S. Ct. at 2413; see also Flippo, 528 U.S. at 14, 120 S. Ct. at 8; Thompson, 469 U.S. at 21, 105 S. Ct. at 411; Tyler, 598 S.W.2d at 801. In this regard, the State "must establish that the circumstances as they appeared at the moment of entry would lead a reasonable, experienced law enforcement officer to believe that someone inside the house . . . required immediate assistance." United States v. Arch, 7 F.3d 1300, 1304 (7th Cir. 1993). Additionally, if the police come upon the scene of a homicide, the officers may "make a prompt

warrantless search of the area to see if there are other victims or if a killer is still on the premises." Mincey, 437 U.S. at 392, 98 S. Ct. at 2413.

The Court in Mincey emphasized that any warrantless search "must be 'strictly circumscribed by the exigencies which justify its initiation.'" 437 U.S. at 393, 98 S. Ct. at 2413. However, in Hicks, 480 U.S. at 325-326, 107 S. Ct. at 1153 (citation omitted), the Court further clarified that

> Mincey v. Arizona, . . . in saying that a warrantless search must be "strictly circumscribed by the exigencies which justify its initiation," was addressing only the scope of the primary search itself, and was not overruling by implication the many cases acknowledging that the "plain view" doctrine can legitimate action beyond that scope.

The plain view doctrine provides that, under certain circumstances, the police may seize evidence in plain view without a warrant. Coolidge, 403 U.S. at 465, 91 S. Ct. at 2037 (plurality opinion). Under the federal constitution, prerequisites to the application of the plain view doctrine include: (1) the officer did not violate constitutional mandates in arriving at the location from which the evidence could plainly be seen; (2) the officer had a lawful right of access to the evidence; and (3) the incriminating character of the evidence was "immediately apparent," i.e., the officer possessed probable cause to believe that the item in plain view was evidence of a crime or contraband. Minnesota v. Dickerson, 508 U.S. 366, 375, 113 S. Ct. 2130, 2136-2137 (1993); Soldal v. Cook County, Illinois, 506 U.S. 56, 65-66, 113 S. Ct. 538, 545-546 (1992); Horton v. California, 496 U.S. 128, 136-137, 110 S. Ct. 2301, 2308 (1990); Hicks, 480 U.S. at 326-327, 107 S. Ct. at 1153-1154. Accordingly, when an officer enters private premises pursuant to exigent or emergency circumstances, the officer may generally seize any apparently incriminating items located on the premises in plain view. Furthermore, an officer may "record by photography scenes presented to [his] plain view." Bills v. Aseltine, 958 F.2d 697, 707 (6th Cir. 1992); see also People v. Reynolds, 672 P.2d 529, 532-533 (Colo. 1983).

Applying the above principles to the facts of the instant case, the appellant's report to the police on December 3, 1997, that he had "just" killed his wife clearly warranted a "reasonable belief" that a person inside the Coulters' home was in need of immediate aid. Accordingly, Thompson and Sloan could enter the Coulters' home without a warrant and search for Ms. Coulter. As noted by Circuit Judge (later Chief Justice) Warren Burger, "[e]ven the apparently dead often are saved by swift police response." Wayne v. United States, 318 F.2d 205, 212 (D.C. Cir. 1963). See also, e.g., People v. McGee, 489 N.E.2d 439, 440-443 (Ill. Ct. App. 1986)(applying the "emergency" exception to the warrant requirement to a police officer's entry into a residence in order to investigate a "strong foul odor" of decomposing flesh as "the odor may have been caused by rotting flesh of a living person after severe burns or other injury"); Colburn v. State, 966 S.W.2d 511, 519 (Tex. Crim. App. 1998)(observing that, although the police officer was informed of defendant's claim that he had just killed a girl in his apartment, "a reasonable officer . . . might have thought there was a possibility that the victim might still be alive, but seriously injured," and the officer's

warrantless search of the apartment was justified under the "Emergency" or "Exigent Circumstances" doctrine).

Upon entering the appellant's home and during the ensuing search for Ms. Coulter, Thompson and Sloan observed in plain view the murder weapon, Ms. Coulter's body, and the sheets, pillows, and pillowcases on Ms. Coulter's bed. The officers clearly possessed probable cause to believe that these "items" were evidence of a crime. They were, therefore, entitled to seize these items. Moreover, they were entitled to photograph the "scenes presented to their plain view." Bills, 958 F.2d at 707. Less easily resolved, however, is the issue of whether Detective Watson and Sergeant Hollins could enter the appellant's home soon thereafter and, with Sloan's assistance, photograph and seize what was in plain view of the initial responding officers.

In upholding "warrantless 'second entries' made by the police following the termination of the emergency that justified an initial entry," Wofford v. State, 952 S.W.2d 646, 653 (Ark. 1997), courts in several of our sister states have held that,

> when a law enforcement officer enters private premises in response to a call for help, and during the course of responding to the emergency observes but does not take into custody evidence in plain view, a subsequent entry shortly thereafter, by detectives whose duty it is to process evidence, constitutes a mere continuation of the original entry. Under such circumstances, it is permissible for the detectives to [seize,] photograph and take measurements [of], without a search warrant, . . . evidence which was in the plain view of the initial responding officers.

State v. Magnano, 528 A.2d 760, 764 (Conn. 1987); see also State v. Spears, 560 So.2d 1145, 1150-1151 (Ala. Crim. App. 1989); Wofford, 952 S.W.2d at 653-654; State v. Johnson, 413 A.2d 931, 933-934 (Maine 1980); Hunter v. Commonwealth, 378 S.E.2d 634, 635-636 (Va. Ct. App. 1989); La Fournier v. State, 280 N.W.2d 746, 750-751 (Wis. 1979). "Whether a subsequent entry is detached from an initial exigency and warrantless entry or is a continuation of the lawful initial entry can be determined only in light of the facts and circumstances of each case," including the time interval between the two entries and the extent to which the later officers do no more than the initial responding officer or officers would have been justified in doing. La Fournier, 280 N.W.2d at 750; cf. Tyler, 598 S.W.2d at 801-802.

Still other courts have relied upon rationales somewhat distinct from the "continuing entry" rationale articulated above in upholding "warrantless 'second entries.'" For example, the United States Court of Appeals for the Fifth Circuit more broadly reasoned that the Fourth Amendment to the United States Constitution protects a citizen against the invasion of privacy. United States v. Brand, 556 F.2d 1312, 1317 (5th Cir. 1977). "Once that interest is invaded legally by an official of the State, the citizen has lost his reasonable expectation of privacy to the extent of the invasion." Id. The court emphasized that additional investigators or officials must confine their intrusion to the scope of the original invasion unless a warrant or one of the exceptions to the warrant requirement justifies further police activity. Id. at n. 9; cf. Mincey, 437 U.S. at 391-392, 98 S. Ct.

at 2413 (rejecting the State's argument that, due to the initial intrusion by police into the defendant's apartment, the defendant had a lessened expectation of privacy in his *entire* home); Thompson, 469 U.S. at 22, 105 S. Ct. 411-412 (reaffirming that police officers' entry into the defendant's home under exigent circumstances did not diminish the defendant's expectation of privacy in her entire home).

> Adopting yet another approach, the North Carolina Supreme Court has held that when a law enforcement officer enters private premises in response to a call for help and thereby comes upon what reasonably appears to be the scene of a crime, and secures the crime scene from persons other than law enforcement officers by appropriate means, all property within the crime scene in plain view which the officer has probable cause to associate with criminal activity is thereby lawfully seized within the meaning of the fourth amendment. Officers arriving at the crime scene thereafter and while it is still secured can examine and remove property in plain view without a search warrant.

State v. Jolley, 321 S.E.2d 883, 886 (N.C. 1984); see also State v. Tidwell, 888 S.W.2d 736, 740-743 (Mo. Ct. App. 1994).

Regardless of the applicable rationale, we must agree with the trial court's determination that, under the facts of this case, the photographs of the crime scene, the murder weapon, and the sheets, pillows, and pillowcases were not the fruit of a Fourth Amendment violation. Our inquiry, however, is not complete as we must now turn to the issue of whether the introduction into evidence of the spent bullet recovered from the box springs of Ms. Coulter's bed was likewise consistent with the Fourth Amendment.

As noted earlier, the evidence adduced at the suppression hearing and at trial revealed that, while Watson and Sloan were collecting evidence on December 3, 1997, paramedics moved Ms. Coulter's body, revealing a bullet hole in the mattress. Detective Watson and Corporal Sloan then discovered the spent bullet "under the mattress in the springs."

Initially, because the police could lawfully seize Ms. Coulter's body, the officers did not violate constitutional mandates in arriving at the location from which the bullet hole could plainly be seen. Cf. Hicks, 480 U.S. at 325-327, 107 S. Ct. at 1153-1154. Moreover, upon observing the bullet hole, the police were entitled to seize the mattress. Therefore, to the extent the officers moved the mattress and exposed the box springs to plain view, they similarly did not violate constitutional mandates. However, it is unclear from the record whether the mattress was, in fact, moved or whether any movement of the mattress exposed the bullet or another bullet hole to plain view. In any event, as applied to the facts of this case, we agree with the observation that, when

> bullet holes [are] visible to the naked eye, . . . police [are] entitled to follow them to retrieve the bullets. This [is] not "a search" because once police [have] observed the holes, defendant [has] no reasonable expectation of privacy in the bullets.

State v. Arias, 661 A.2d 850, 857 (N.J. Super. Ct. Law Div. 1992);[4] see also Commonwealth v. Mitchell, 414 A.2d 1021, 1022-1023 (Penn. 1980); State v. Hebard, 184 N.W.2d 156, 168 (Wis. 1971), overruled on other grounds by Schimmel v. State, 267 N.W.2d 271 (Wis. 1978). In sum, we conclude that the trial court properly denied the appellant's motion to suppress. This issue is without merit.

### c.    Notes and Letters

Relying upon general evidentiary rules of relevance, the appellant also contends that the trial court erred in denying his pre-trial motion to exclude from evidence the notes and letters written by him to his wife prior to this offense. Tenn. R. Evid. 401, 402, & 403. The appellant asserts that the letters were "not relevant to any of the issues presented and serve[d] only to inflame the jury against the defendant based on his use of sexually graphic language." The State responds that the letters were relevant to the appellant's "design and intent, which [are] critical elements of first degree murder." We conclude that the trial court properly denied the appellant's motion.

### 1.    Trial Court Proceedings

The appellant filed a motion to suppress the disputed notes and letters on February 22, 1999. The trial court heard the appellant's motion at the February 26, 1999 hearing. At this hearing, defense counsel argued:

> These parties were obviously having marital problems. Many of these notes are Mr. Coulter's complaint of lack of sexual relations, phrased one way or another, between he and his wife. The language in there would be somewhat prejudicial due to the graphic nature of it. They have zero relevance to this case. The complaint of lack of sexual matters between a husband and wife is made daily in this country. I do a ton of divorce work and it's a gripe I all the time hear. Very few of these men go out there and kill their wives over that.
>
> So it doesn't come close to making more probable than not any issue involved in this case. The only possible purpose of putting these type of notes in there would be to inflame the jury against my client.

In response, the prosecutor argued that the notes and letters were highly relevant but also noted that the admissibility of the disputed documents was "more attuned to . . . prior bad acts." The trial court

---

[4]The New Jersey court in Arias, 661 A.2d at 857, analogized bullet holes in "walls, furniture and plants" to containers, echoing the United States Supreme Court's observation in Arkansas v. Sanders, 442 U.S. 753, 764 n. 13, 99 S. Ct. 2586, 2593 n.13 (1979), overruled on other grounds by California v. Acevedo, 500 U.S. 565, 579, 111 S. Ct. 1982, 1991 (1991), that "some containers (for example a kit of burglar tools or a gun case) by their very nature cannot support any reasonable expectation of privacy because their contents can be inferred from their outward appearance." Cf. Illinois v. Andreas, 463 U.S. 765, 771-772, 103 S. Ct. 3319, 3324 (1983)("[O]nce a container has been found to a certainty to contain illicit drugs, the contraband becomes like objects physically within the plain view of the police, and the claim to privacy is lost.")(footnote omitted). Accordingly, the New Jersey court concluded that, "when police followed a hole in the wall cavity, loveseat, floor or baseboard, they did not trample on Fourth Amendment rights." Arias, 661 A.2d at 857.

deferred ruling upon the appellant's motion, instead granting the parties an opportunity to submit briefs.

The prosecutor submitted a brief to the court on March 8, 1999. As relevant to this appeal, the prosecutor explained that the notes and letters were highly relevant to the State's case because they demonstrated the nature of the Coulters' relationship prior to Ms. Coulter's murder, including the appellant's "sustained hostility and animosity toward his wife," and also established a possible motive for the killing. Accordingly, the notes and letters constituted an integral part of the State's proof of intent and premeditation.

Defense counsel filed a response on March 15, 1999. In relevant part, defense counsel again disputed the State's claim that the documents were relevant. In this regard, counsel noted that some of the letters are undated. Accordingly, "even assuming the notes were some indication of the state of mind of the defendant, it is impossible to know when the defendant was thinking these things." Moreover, counsel asserted that, even if in close temporal proximity to Ms. Coulter's murder, statements by the appellant concerning the Coulters' marital difficulties, including a lack of sexual relations, were "not relevant to the alleged crime." Finally, citing Tenn. R. Evid. 403, the appellant claimed that any relevance of the notes and letters was substantially outweighed by "the danger of unfair prejudice and misleading the jury."

Subsequently, at a May 10, 1999 hearing, the Court ruled upon the appellant's motion:

> I've read these memorandums, and I've read the notes and the various letters that were submitted. And in this case it is incumbent upon me under the rules of evidence, particularly 403(b), I believe it is. Let me get that citation exactly correct. It may be 404(b). We have a determination first of the issue that this particular material would come in on, and thereafter have a balancing test to determine whether it should or should not - - it's 404(b) - - come in.
>
> . . . [I]n this particular case, there is going to be an issue under 39-13-202 of design and intent of the Defendant because those are critical elements of the offense of first degree murder. And it appears that these notes and memorandums and letters are material to that issue.
>
> So then we go to the balancing test in this particular case on that material issue of the design and intent, and it appears that the probative value of these documents outweigh the prejudice to the Defendant . . . . So I'm finding that the letters which surround and precede the death are capable of introduction.

Immediately thereafter, defense counsel inquired if the trial court's ruling extended to undated notes and letters. The court responded that the undated documents

appear all to fall within the same format of the discussion of the issues of the difficulties in the marriage relationship leading up to the discord, and I find that they are probative and that the probative value outweighs the prejudice.

On May 21, 1999, the trial court also entered into the record a written order denying the appellant's motion.

### 2. Analysis

When the decision of a trial court is based on the relevance of the proffered evidence under Tenn. R. Evid. 401, 402, and 403, the standard of review is abuse of discretion. State v. DuBose, 953 S.W.2d 649, 652 (Tenn. 1997). Yet, unsolicited by the appellant, the trial court in this case apparently based its ruling upon Tenn. R. Evid. 404(b). Our supreme court has held that the decision of a trial court to admit evidence of "other crimes, wrongs, or acts" under Rule 404(b) "should be afforded no deference unless there has been substantial compliance with the procedural requirements of the Rule." DuBose, 953 S.W.2d at 652. The record, in fact, reflects the trial court's substantial compliance with those requirements. Nevertheless, as already noted, the appellant predicates his complaint on appeal wholly upon Tenn. R. Evid. 401, 402, and 403. In short, we choose to address the appellant's complaint as presented to this court. Cf. Tenn. R. Crim. P. 52(b).

Turning to the appellant's complaint, relevant evidence is generally admissible pursuant to Rule 402. "'Relevant evidence' means evidence having any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." Tenn. R. Evid. 401. Relevant evidence need not be sufficient to satisfy a party's burden of proof; rather, "[e]ach item of proof may make a small, incremental contribution to a party's total efforts to meet its proof obligations." NEIL P. COHEN ET AL., TENNESSEE LAW OF EVIDENCE § 401.4, at 86 (Michie ed., 3d ed. 1995).

However, Rule 403 prohibits the introduction of even relevant evidence "if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury, or by considerations of undue delay, waste of time, or needless presentation of cumulative evidence." Specifically addressing the danger of unfair prejudice, this court has elaborated that evidence should not be admitted when its primary purpose "is to elicit emotions of 'bias, sympathy, hatred, contempt, retribution, or horror.'" State v. Collins, 986 S.W.2d 13, 20 (Tenn. Crim. App. 1998). That having been said, "unfair prejudice" should be carefully distinguished from the prejudice "naturally flow[ing] from all admissible evidence [that] is intended to persuade the trier of fact." State v. Hayes, 899 S.W.2d 175, 183 (Tenn. Crim. App. 1995). In other words, "the mere fact that evidence is particularly damaging does not make it unfairly prejudicial." State v. Gentry, 881 S.W.2d 1, 7 (Tenn. Crim. App. 1993); see also State v. Jerry Lee Hunter, No. 01C01-9411-CC-00391, 1996 WL 10086, at *6 (Tenn. Crim. App. at Nashville, January 11, 1996)(observing that "any evidence, whether introduced by the prosecution or the defense, is prejudicial").

In determining the admissibility of evidence under the above rules, "the trial court must consider, among other things, the questions of fact that the jury will have to consider in determining the accused's guilt as well as other evidence that has been introduced during the course of the trial." State v. Williamson, 919 S.W.2d 69, 78 (Tenn. Crim. App. 1995). In this case, the jury was required to find beyond a reasonable doubt that the appellant committed an intentional and premeditated killing. Tenn. Code Ann. § 39-13-202(a) (1997). "'Intentional' refers to a person who acts intentionally with respect to the nature of the conduct or to a result of the conduct when it is the person's conscious objective or desire to engage in the conduct or cause the result." Tenn. Code Ann. § 39-11-302(a) (1997). Premeditation, in turn, "means that the intent to kill must have been formed prior to the act itself." Tenn. Code Ann. § 39-13-202(d). Moreover, premeditation entails the exercise of reflection and judgment. Id.

Because the appellant in this case did not dispute that he had killed his wife, the principal issue at trial was whether the appellant possessed the requisite mental state, particularly premeditation. Our supreme court has noted that "a determination of culpable mental states, such as premeditation . . . , must [often] be inferentially made from the circumstances surrounding the killing." State v. Hall, 958 S.W.2d 679, 704 (Tenn. 1997). Among the relevant circumstances are facts about the defendant's prior relationship and conduct with the victim from which the jury may infer a motive. Id.; see also State v. Jones, 15 S.W.3d 880, 889 (Tenn. Crim. App. 1999); State v. Schafer, 973 S.W.2d 269, 273 (Tenn. Crim. App. 1997); State v. Bordis, 905 S.W.2d 214, 222 (Tenn. Crim. App. 1995); Gentry, 881 S.W.2d at 5.

Thus, for example, in affirming a defendant's conviction of first degree murder in State v. Stephen Lajaun Beasley, No. 03C01-9509-CR-00268, 1996 WL 591203, at **1 & 4 (Tenn. Crim. App. at Knoxville, October 10, 1996), we observed that the jury could infer a motive and, therefore, premeditation from the defendant's "stormy relationship" with the victim, a relationship that had culminated in a separation immediately prior to the murder. See also State v. Richardson, 875 S.W.2d 671, 674 (Tenn. Crim. App. 1993)(holding that the evidence adduced at trial including evidence of ongoing animosity between the defendant and the victim was sufficient to sustain the defendant's conviction of attempted first degree murder); State v. Johnny O. Clark, No. 02C01-9708-CR-00307, 1998 WL 170141, at *4 (Tenn. Crim. App. at Jackson, April 14, 1998)(observing that the jury could infer premeditation from evidence that the "appellant and the victim had an oral argument three days prior to the homicide"); cf. State v. Smith, 868 S.W.2d 561, 574 (Tenn. 1993)(confirming that, under Tenn. R. Evid. 404(b), "violent acts indicating the relationship between the victim of a violent crime and the defendant prior to the commission of the offense are relevant to show defendant's hostility toward the victim, malice, intent, and a settled purpose to harm the victim"); State v. Jackie Lee Redd, No. 03C01-9101-CR-0007, 1991 WL 136316, at *2 (Tenn. Crim. App. at Knoxville, July 25, 1991)(observing that the defendant's act of spitting on the victim "revealed some deep animosity toward the victim, from which premeditation for the killing a few minutes later can be inferred"). Conversely, in Schafer, 973 S.W.2d at 273, this court held that the State had failed to prove premeditation due, in part, to the lack of any proof of motive: Specifically, we stated that "the proof demonstrate[d] no argument between the [the defendant and the victim].

The proof further demonstrate[d] little to no prior relationship between the defendant and [the victim]." Id.

In this case, although the State introduced other evidence concerning the Coulters' relationship prior to this offense, the challenged notes and letters uniquely imparted the appellant's perspective on his marriage and on his ongoing dispute with his wife as the appellant wrote the notes and letters contemporaneously with the dispute. Thus, by virtue of these documents, the jury was able to more accurately assess the bitterness of the dispute, which persisted for at least one year prior to this offense. Again, several of the documents reflect the appellant's anger at his wife's withdrawal from any intimacy with him and possible infidelity despite her continued cohabitation with him. More importantly, several documents also reflect the appellant's fervent desire to reconcile with his wife and his opposition to ending their marriage. In assessing whether this evidence could reasonably affect the probability of premeditation in the context of other evidence introduced at trial, the trial court was entitled to "draw upon common sense, general knowledge, and its understanding of human conduct and motivation." Hayes, 899 S.W.2d at 183.

We note in passing that the appellant does not argue on appeal that the undated notes and letters were inadmissible due to any possible lack of temporal proximity to the murder. In any event, this court has observed that, "while 'a lapse of time may, of course, affect [the relevance of evidence], it is the rational connection between events, not the temporal one, that determines whether the evidence has probative value.'" Gentry, 881 S.W.2d at 7 (approving the admission of evidence that the defendant threatened the victim over a period of years before murdering him)(alteration in original); see also State v. Ronald Jeffery Davis, No. 03C01-9511-CC-00360, 1997 WL 184771, at *3 (Tenn. Crim. App. at Knoxville, April 17, 1997)(approving the admission of evidence that the defendant delivered a threatening message to the victim approximately four or five months before attempting to murder him). Moreover, it is apparent from both the contents of the notes and letters and other evidence introduced at trial that the appellant wrote them during the year preceding this offense.

Again, the appellant asserts that, notwithstanding any probative value of the notes and letters, that value was substantially outweighed by the danger of unfair prejudice due to the appellant's use of "sexually graphic language." We submit, however, that this language itself possessed great probative value in showing the degree of the appellant's animosity toward his wife. Cf. State v. Audrey Martin, No. 299, 1990 WL 18173, at *3 (Tenn. Crim. App. at Knoxville, March 1, 1990). Moreover, having carefully reviewed the notes and letters, we cannot say that the introduction of the challenged documents posed any significant danger of unfair prejudice. In sum, we decline to disturb the trial court's exercise of its discretion. This issue is without merit.

e.      **Ms. Coulter's Plans to Move**

Relying once more upon general evidentiary rules of relevance, the appellant further argues that the trial court erred in denying his pre-trial motion to exclude from evidence any proof of Ms. Coulter's plans to move from the Coulters' mobile home into an apartment. The appellant asserts that he was "completely unaware" of Ms. Coulter's plans to move; therefore, this evidence

was irrelevant to the principal issue at his trial of whether he possessed the requisite mental state for first degree premeditated murder and, moreover, "served to the substantial prejudice of the defendant [and] confused the jury." The State disagrees, and so do we.

Initially, the State correctly notes in its brief that the fact of the Coulters' imminent separation, whether known by the appellant or not, substantiated the deterioration of their relationship prior to this offense. More importantly, the appellant's assertion that, at the time of the murder, he was "*completely* unaware" of his wife's plans "to relocate herself" is belied by the record before this court. Briefly recapitulating, the appellant himself stated to police that his wife had repeatedly informed him of her intention to move as soon as she was financially able to do so and that his wife had further indicated her intention to obtain a restraining order when she moved. The appellant was served with an order of protection only hours prior to the murder. Moreover, photographs of the crime scene depict several moving boxes in Ms. Coulter's bedroom. Sergeant Hollins further testified that clothes were lying openly about Ms. Coulter's bedroom, seemingly in preparation for packing. The appellant apparently had free access to Ms. Coulter's bedroom as there was no lock on the bedroom door. Additionally, in one of his letters to Ms. Coulter, the appellant complained that she was "collecting boxes, getting newspapers and calling about places to live." Although this letter was undated, the appellant referred in the letter to the sexually explicit letters that were written by his wife and that he discovered approximately four months prior to this offense. In sum, the disputed proof was relevant and posed no danger of unfair prejudice or confusion of the issues. Accordingly, the appellant's claim is without merit.

### f.    Sybil Victory's Testimony

The appellant next contends that the trial court erred in overruling his objection to testimony by Sybil Victory concerning her telephone conversation with Ms. Coulter approximately five or six months prior to this offense and statements that were made in the background by a man to whom Ms. Coulter referred as "Larry." The appellant rests his challenge upon Tenn. R. Evid. 602, arguing that the State failed to establish that Ms. Victory possessed "personal knowledge" "as to the sound of [the appellant's] voice and did not have the ability to identify his voice." The State responds:

> Ms. Victory reasonably thought that she could identify the voice she heard yelling at Mrs. Coulter as the defendant's. She was rigorously cross-examined about the basis of her identification. The trial court correctly allowed the jury to determine the weight to be given Ms. Victory's identification of the defendant.

We conclude that this issue, also, is without merit.

Initially, we note that Victory did not identify the voice in question as the voice of the appellant. Indeed, she specifically conceded that this telephone conversation was the sole occasion on which she had ever heard the voice in question. Again, Victory merely testified that she called Ms. Coulter "at home," a man's voice answered the telephone, Ms. Coulter subsequently referred to the man who answered the telephone as "Larry," and Victory overheard this man cursing at Ms. Coulter and complaining concerning Ms. Coulter's use of the telephone. There is no dispute that

Victory had personal knowledge of these facts. Accordingly, Victory's testimony was entirely consistent with Tenn. R. Evid. 602.

At trial, without citing the pertinent rule of evidence, the appellant objected to Victory's testimony on the basis that the State had failed to "lay a foundation that that was Larry Coulter that she . . . heard." To the extent the appellant is, in fact, relying upon Tenn. R. Evid. 104(b) and Tenn. R. Evid. 901 in this appeal, we consider his brief to be inadequate, Tenn. Ct. of Crim. App. Rule 10(b); Tenn. R. App. P. 27(a)(7), nor is relief otherwise warranted. Tenn. R. Crim. P. 52(b).

### g.    Fawn Jones' Testimony

Citing Tenn. R. Evid. 615, the appellant next asserts that the trial court erred in overruling his objection to testimony by Fawn Jones notwithstanding her presence in the courtroom when the State played to the jury the video cassette recording of McVicker's deposition. The State responds that the trial court acted within its discretion, and we agree.

### 1.    Trial Court Proceedings

On December 22, 1998, the State filed a motion pursuant to Tenn. R. Evid. 615 to sequester all witnesses testifying at the appellant's trial, which motion the trial court granted. Subsequently, during the appellant's trial, defense counsel interrupted the testimony of a State's witness, Fawn Jones. In a bench conference outside the jury's hearing, defense counsel notified the court that

> [co-counsel] has just made me aware this witness was in the courtroom earlier during at least part, if not all, of Mr. McVicker's testimony, so she has apparently violated the rule that we had in effect in this case. So I object to her being able to testify at all.

The prosecutor responded that Jones had entered the courtroom during a lull in proceedings and that he had immediately asked her to leave the courtroom. The prosecutor asserted, "And at that time there was no witness nor was the tape being played." Defense counsel, in turn, acknowledged that "[the prosecutor] did ask her to leave, apparently as soon as he knew about it." Following this exchange, the trial court determined:

> This is within the discretion of the trial court. And considering what testimony she's testifying about and the relationship of what previously was testified, I overrule the objection.

### 2.    Analysis

Tenn. R. Evid. 615 is commonly referred to as the "rule of sequestration" and provides:

> At the request of a party the court shall order witnesses, including rebuttal witnesses, excluded at trial . . . . The court shall order all persons not to disclose by any means to excluded witnesses any live trial testimony or exhibits created in the courtroom by a witness.

"The purpose of the rule is to prevent one witness from hearing the testimony of another and adjusting his testimony accordingly." State v. Harris, 839 S.W.2d 54, 68 (Tenn. 1992); see also State v. Larry S. Brumit, No. M1999-00154-CCA-R3-CD, 2000 WL 502681, at *14 (Tenn. Crim. App. at Nashville, April 28, 2000), perm. to appeal denied, (Tenn. 2000). "'The rule' may be invoked at anytime and is mandatory." State v. Anthony, 836 S.W.2d 600, 605 (Tenn. Crim. App. 1992).

Notwithstanding its mandatory nature, the rule does not set forth a sanction for its violation. However, this court has observed that, in the most egregious cases, possible sanctions include the declaration of a mistrial or the preclusion of a witness from testifying. Anthony, 836 S.W.2d at 605; State v. Jackie Dean Mayes, Jr., No. 01C01-9806-CR-00265, 1999 WL 771011, at *3 (Tenn. Crim. App. at Nashville, September 30, 1999). In contrast, "[i]f a witness inadvertently and unintentionally hears some trial testimony, the sense of the rule would permit the judge to allow the witness to testify if fair under the circumstances." Tenn. R. Evid. 615, Advisory Commission Comments. In those less egregious cases, "[a] violator may be subjected to cross-examination about the incident . . . [and] [a] jury could be instructed to consider the violation of the sequestration order in assessing the witnesses' testimony." Anthony, 836 S.W.2d at 605; see also Mayes, No. 01C01-9806-CR-00265, 1999 WL 771011, at *3.

The trial judge is afforded wide discretion in determining whether a case is sufficiently egregious to warrant either the declaration of a mistrial or the preclusion of a witness from testifying. Brumit, No. M1999-00154-CCA-R3-CD, 2000 WL 502681, at *14. For the purpose of determining both the facts of the violation and the appropriate sanction, trial courts in Tennessee generally hold a jury-out hearing. State v. Victoria Voaden, No. 01C01-9305-CC-00151, 1994 WL 714223, at *9 (Tenn. Crim. App. at Nashville, December 22, 1994). Once the facts of the violation are established, the appropriate sanction will generally depend upon the following factors: (1) the harm caused by the sequestration violation; (2) the importance of the testimony of the witness who ignored the sequestration decree; and (3) who was at fault in the violation, i.e., was it accidental or intentional? NEIL P. COHEN ET AL., TENNESSEE LAW OF EVIDENCE § 615.4, at 431 (Michie ed., 3d ed. 1995).

On appeal, in reviewing the trial court's exercise of its discretion, this court must consider both "the seriousness of the violation and the prejudice, if any, that enured to the [appellant]." State v. James Edward French, No. 03C01-9503-CR-00096, 1996 WL 138289, at *6 (Tenn. Crim. App. at Knoxville, March 28, 1996). However, it is not entirely clear from the record in this case that a sequestration violation occurred. The representations of defense counsel and the prosecutor significantly differed, and the trial court did not conduct a jury-out hearing for the purpose of determining whether or not Jones was exposed to McVicker's testimony and, if so, to what extent.

Indeed, the appellant did not request an evidentiary hearing. Of course, the appellant's failure raises the issue of whether or not the trial court was required to conduct an evidentiary hearing sua sponte. Cf., e.g., State v. Nguyen, 756 A.2d 833, 835 & 840-844 (Conn. 2000)(interpreting its own, distinct rule of sequestration and holding that, "although the trial court must conduct a preliminary inquiry of counsel when presented with a facially credible allegation that

a sequestration order has been violated, whether to conduct an evidentiary hearing sua sponte is a matter within the trial court's discretion"). However, we note that, notwithstanding any error by the trial court, the appellant did not attempt to make an offer of proof for purposes of appeal.

In any event, even assuming that Jones was present in the courtroom when the State played to the jury the video cassette recording of McVicker's testimony, it is undisputed that the violation of the rule was purely accidental. Moreover, our review of the record satisfies us that no prejudice enured to the appellant. Although Jones' testimony was related to McVicker's testimony in the very broad sense that both testimonies concerned the breakdown of the appellant's relationship with his wife at the time of this offense, the specific facts to which each witness testified were discrete. More importantly, Jones' testimony was largely cumulative of other evidence adduced at trial. Accordingly, the possibility that Jones altered her testimony to conform to McVicker's was minimal. Finally, we must agree with the State that the appellant's failure to cross-examine Jones concerning her exposure to McVicker's testimony or request a jury instruction concerning Jones' exposure suggests an absence of any urgent concern by the appellant about possible prejudice. Tenn. R. App. P. 36(a). This issue is without merit.[5]

### h.    Bullet Recovered from the Victim's Body

The appellant couches his next complaint in the following manner: "The trial court erred in overruling defendant's objection to allowing the State to enter testimony regarding the alleged bullet recovered from the victim's body due to the fact that the bullet was not made available to the defendant as the same was lost by the LaVergne Police Department." However, the appellant's argument encompasses testimony by the State's firearms identification expert concerning both the bullet recovered from Ms. Coulter's bed and the bullet recovered from her brain. Specifically, the appellant cites State v. Ferguson, 2 S.W.3d 912 (Tenn. 1999), and argues that the loss of both bullets by the La Vergne Police Department resulted in a trial lacking fundamental fairness. Alternatively, the appellant cites Tenn. R. Evid. 403 and asserts that, due to the loss of the bullets, any probative value of the disputed testimony was substantially outweighed by the danger of unfair prejudice. The State responds that, "because the defendant was not denied a fair trial by the introduction of the evidence, the defendant is not entitled to any relief on this issue." We conclude that the trial court properly overruled the appellant's objection.

### 1.    Trial Proceedings

As noted previously, the State introduced at trial the testimony of Donald Carman, an expert in firearms identification employed by the TBI. Again, Carman testified that he performed testing on the appellant's Taurus .38 Special revolver, the bullet recovered from Ms. Coulter's bed, and the bullet recovered from Ms. Coulter's brain, and he determined that the bullets were fired from the appellant's revolver. Defense counsel interjected an objection to Carman's testimony on the

---

[5]The advisory commission comments to Tenn. R. Evid. 615 state: "This rule does not prohibit a witness from reviewing depositions of other witnesses before testifying." See also State v. Jackson, 889 S.W.2d 219, 223 (Tenn. Crim. App. 1993). However, in light of the purpose of the rule, we doubt this statement encompasses depositions that a party intends to introduce at trial in lieu of live testimony. Tenn. R. Crim. P. 15.

basis that both bullets were "unavailable." The State responded that the appellant had been provided Carman's report well in advance of trial and, moreover, questioned whether the appellant would have conducted independent testing of the bullets had they been available. The trial court summarily overruled the objection.

###    2.    Analysis

In Ferguson, 2 S.W.3d at 915, our supreme court addressed "what consequences flow from the State's loss or destruction of evidence alleged to have been exculpatory." Specifically, the court rejected the analysis set forth in Arizona v. Youngblood, 488 U.S. 51, 109 S. Ct. 333 (1988), to the extent the United States Supreme Court required that a defendant show bad faith on the part of police in order to establish a denial of due process of law. Ferguson, 2 S.W.3d at 917. Instead, the court applied due process principles embodied in Article 1, Section 8 of the Tennessee Constitution and "promulgate[d] . . . an analysis in which the critical inquiry is: Whether a trial, conducted without the [lost or] destroyed evidence, would be fundamentally fair?" Id. at 914 (footnote omitted).

In resolving the question of fundamental fairness, a court must first determine whether the State had a duty to preserve the lost or destroyed evidence. Id. at 917. In this regard, the supreme court observed that, "[g]enerally speaking, the State has a duty to preserve all evidence subject to discovery and inspection under Tenn. R. Crim. P. 16, or other applicable law." Id. However, for purposes of fundamental fairness, the court seemingly cited with approval the following statement by the United States Supreme Court in California v. Trombetta, 467 U.S. 479, 488-489, 104 S. Ct. 2528, 2534 (1984)(footnote and citation omitted):

> Whatever duty the Constitution imposes on the States to preserve evidence, that duty must be limited to evidence that might be expected to play a significant role in the suspect's defense. To meet this standard of constitutional materiality, evidence must both possess an exculpatory value that was apparent before the evidence was destroyed, and be of such a nature that the defendant would be unable to obtain comparable evidence by other reasonably available means.

Ferguson, 2 S.W.3d at 917.

Only if the proof demonstrates the existence of a duty to preserve and further shows that the State has failed in that duty must a court turn to a balancing analysis involving consideration of the following factors:

> 1. The degree of negligence involved;
> 2. The significance of the destroyed evidence, considered in light of the probative value and reliability of secondary or substitute evidence that remains available; and
> 3. The sufficiency of the other evidence used at trial to support the conviction.

Id. (footnote omitted). See also State v. Ricky Hill Krantz, No. M1999-02437-CCA-RM-CD, 2000 WL 59915, at *1 (Tenn. Crim. App. at Nashville, January 25, 2000), perm. to appeal denied, (Tenn.

-45-

2000).  If the court's consideration of these factors reveals that a trial without the missing evidence would lack fundamental fairness, the court may consider several options.  For example, the court may dismiss the charges or, alternatively, provide an appropriate jury instruction.  Id.  Again, the appellant in this case asserts only that the trial court should have excluded Carman's testimony concerning testing performed upon the spent bullets.

Applying the above analysis to the instant case, we note that, although furnished with Carman's report prior to trial, the appellant has never demonstrated any flaw in Carman's testing methodology or otherwise questioned the results of Carman's testing.  Indeed, the appellant has never disputed that he killed his wife using the Taurus .38 Special revolver, nor does the record contain a scintilla of evidence suggesting otherwise.  In short, to conclude that the bullets possessed exculpatory value on the basis of the record before this court would constitute an exercise in pure speculation.  Cf. Trombetta, 467 U.S. at 488-491, 104 S. Ct. at 2534-2535 (holding that, when "the chances [were] extremely low that preserved samples would have been exculpatory," the Due Process Clause of the Fourteenth Amendment did not require law enforcement agencies to preserve breath samples in order to introduce the results of breath-analysis tests at trial); Youngblood, 488 U.S. at 56 n. 1, 109 S. Ct. at 336 n.1 (noting that "[t]he possibility that . . . semen samples could have exculpated respondent if preserved or tested is not enough to satisfy the standard of constitutional materiality in Trombetta").  Therefore, the appellant is not entitled to relief under either the federal or state constitution.  Moreover, we decline to address the appellant's claim under our rules of evidence as the appellant raises the admissibility of the spent bullets under Tenn. R. Evid. 403 for the first time in this appeal.  "[A] party is bound by the ground asserted when making an objection.  The party cannot assert a new or different theory to support the objection in the motion for a new trial or in the appellate court."  State v. Adkisson, 899 S.W.2d 626, 634-635 (Tenn. Crim. App. 1994).  This issue is without merit.

### i.     The Jury's "Dry-Firing" of the Murder Weapon

The appellant also argues that the trial court erred in overruling his objection to the State's request that the jury be permitted to "dry-fire" the murder weapon during his trial.  The appellant relies upon general evidentiary rules of relevance, including Tenn. R. Evid. 401, 402, and 403.  The appellant also vaguely asserts that permitting the jurors themselves to participate in a courtroom demonstration is "highly irregular."  The State primarily responds that, in contrast to the appellant's arguments on appeal, the appellant's "arguments at the time of his objection [only] noted that the jury would be allowed the opportunity to pull the weapon's trigger during its deliberation."  We again conclude that the appellant is not entitled to relief.

#### 1.     Trial Court Proceedings

In summary, Special Agent Carman testified at the appellant's trial concerning the steps required to fire the appellant's Taurus .38 Special revolver and the amount of pressure required to pull the trigger on the revolver.  Following Carman's testimony and in the presence of the jury, the prosecutor inquired of the trial court:

> Judge, I would like for the members of the jury to stand down and each one to pull the trigger of that gun so that they can find out for themselves how easy or difficult it is.

Still in the jury's presence, defense counsel responded that "[t]here's no sense in them coming down and pulling the trigger on this." Specifically, he observed that the weapon was an exhibit, and the jury members would have an opportunity to pull the trigger during their deliberations. In turn, the prosecutor explained to the court:

> Judge, I'd just like to make sure that they did. I think it's important. [The appellant] said something about I walked in there and then there was a pop and then there was another pop in part of his statement. It sounds like that this gun just kind of went off by itself.

Upon receiving this explanation, the court overruled the appellant's objection and permitted the demonstration.

### 2.      Analysis

As conceded by the appellant, whether to allow a courtroom demonstration is a matter that rests within the sound discretion of the trial court and will not be reversed on appeal absent an abuse of discretion. State v. Underwood, 669 S.W.2d 700, 704 (Tenn. Crim. App. 1984)(stating that "we see no reason why [a reenactment of the second degree murder by the sheriff and a police officer] is not admissible within the discretion and control of the trial judge"); State v. Billy Gene DeBow, Sr., No. M1999-02678-CCA-R3-CD, 2000 WL 1137465, at **10-11 (Tenn. Crim. App. at Nashville, August 2, 2000), perm. to appeal denied, (Tenn. 2001)(approving a courtroom demonstration by a TBI special agent of the shell ejection pattern of the shotgun used in a first degree murder); Ronald Bradford Waller v. State, No. E1999-02034-CCA-R3-PC, 2000 WL 982103, at **12-16 (Tenn. Crim. App. at Knoxville, July 18, 2000), perm. to appeal denied, (Tenn. 2001)(approving a courtroom demonstration by a testifying defendant of the manner in which he allegedly fended off an attack by the murder victim). Obviously, the trial court's exercise of discretion is circumscribed by the Tennessee Rules of Evidence. In this regard, "[d]emonstrative evidence is admissible only if relevant under [Tenn. R. Evid.] 401." Waller, No. E1999-02034-CCA-R3-PC, 2000 WL 982103, at *15. In other words, demonstrative evidence should "assist the trier of fact in understanding and evaluating the other evidence offered at trial." Id. Moreover, "[d]emonstrative evidence is . . . often attacked . . . on grounds that it is too prejudicial under Rule 403." Id.

That having been said, we must agree with the State that defense counsel based his objection in the trial court solely upon the timing of the demonstration rather than the relevance of the demonstration, any danger of unfair prejudice, or any "highly irregular" aspect of the demonstration. A generous interpretation of defense counsel's objection would encompass the argument that the probative value of the demonstration was substantially outweighed by the consideration of "waste of time" under Tenn. R. Evid. 403. The appellant echoes this argument in his brief on appeal by his repeated citation to Tenn. R. Crim. P. 30.1.

We reiterate that a party is bound by the ground asserted when making an objection, State v. Adkisson, 899 S.W.2d 626, 634-635 (Tenn. Crim. App. 1994), and we will not hold a trial court in error when it was not provided an opportunity to rule on the issue raised on appeal, State v. Walker, 910 S.W.2d 381, 396 (Tenn. 1995). Therefore, affording the appellant the generous interpretation of his objection, we will only address whether the probative value of the demonstration in this case was substantially outweighed by the consideration of "waste of time" under Tenn. R. Evid. 403.

The State was required to prove beyond a reasonable doubt that the appellant committed an intentional and premeditated killing. Tenn. Code Ann. § 39-13-202(a) (1997). The principal issue at trial was whether or not the appellant possessed the requisite mental state of intent and premeditation, albeit the appellant's defense focused upon the requirement of premeditation. As noted by the prosecutor, the appellant's audio taped account of the murder indicated that the appellant could not recall consciously exerting pressure on the trigger of his revolver; rather, he simply heard the revolver discharge. In light of the appellant's account, the State needed to eliminate any reasonable doubt stemming from a possibility that the weapon accidentally discharged or otherwise discharged without the appellant's "conscious objective or desire." Tenn. Code Ann. § 39-11-302(a) (1997). Therefore, the amount of pressure required to pull the trigger of the revolver, particularly in the double action mode, was relevant, and permitting each member of the jury to pull the trigger undoubtedly assisted him or her in understanding Special Agent Carman's testimony. Indeed, one court has observed that

> [d]emonstrating the working of machinery is an accepted part of evidence. . . . "In general, when a question arises whether at a certain machine, house, field, mine, or other thing, a certain act can be done under given conditions of time, strength, skill, or achievement, one way [to obtain the answer] is to speculate about it, and another way is to try it; and it is a crude error to suppose that the law of evidence here prefers speculation to experience, abhors actual experiment, and delights in guesswork."

Bowlin v. State, 823 P.2d 676, 678 (Alaska Ct. App. 1991)(alteration in original).

Defense counsel correctly noted to the trial court that the jury could examine the weapon during the course of its deliberations, including pulling the trigger. See, e.g., State v. Donald Korpan, No. 89-261-III, 1991 WL 1345, at **8-9 (Tenn. Crim. App. at Nashville, January 11, 1991); cf. State v. Rainer, 411 N.W.2d 490, 498-499 (Minn. 1987); State v. Thompson, 524 P.2d 1115, 1119-1120 (Mont. 1974); State v. Chamberlain, 819 P.2d 673, 681-683 (N.M. 1991). However, without explanation, defense counsel further argued that the jury's ability to examine the weapon during deliberations precluded a courtroom examination. In light of the relevance of the demonstration, we believe that the trial court acted within its discretion in determining that a courtroom demonstration was an "efficient use of judicial resources." NEIL P. COHEN ET AL., TENNESSEE LAW OF EVIDENCE § 403.6, at 154 (Michie ed., 3d ed. 1995). This issue is without merit.

**j.      McVicker's Testimony**

The appellant additionally contends that the trial court erred in permitting Robert McVicker, a State's witness, to testify by videotaped deposition pursuant to Tenn. R. Crim. P. 15. In this regard, the appellant specifically argues that McVicker was not "unavailable" within the meaning of Tenn. R. Crim. P. 15(h). The State simply responds that "exceptional circumstances" warranted the use of a deposition. We conclude that any error by the trial court was harmless.

### 1. Trial Court Proceedings

On May 6, 1999, the State filed a motion asking that the trial court "allow the testimony of Mr. Robert McVicker . . . to be taken prior to trial, preserved on videotape and played for the jury during the trial." In the motion, the State asserted that McVicker would be unavailable on the scheduled trial dates. The trial court conducted a hearing on the State's motion on May 10, 1999. At the hearing, the State presented the following testimony by McVicker in support of its motion:

> [The week of the appellant's trial] has been scheduled in my family for vacation for a couple of months. My wife is also employed with the Metro Davidson County Board of Education as an educator, and that is the week that's pretty much mandated by her occupation for vacation. In addition to that, my stepchildren, that's the last week that they're with us before going back to their father's for the summer. So that was the only week that we could come up with that we could go on vacation.

Following McVicker's testimony, the prosecutor clarified that McVicker had been subpoenaed as a witness at the appellant's trial, but he maintained that, under Tenn. R. Crim. P. 15, "exceptional circumstances" warranted the witness' testimony by deposition:

> Your Honor, the State would argue that the exceptional circumstances are these, is that [he has] very limited knowledge. [His] testimony, the State anticipates, will be less than five minutes . . . , that [he] will be unavailable during the week of that trial. [He is] available any time other than that week of trial. [He is] making [himself] available. [He] want[s] to honor the subpoena. [He has] come here and brought this to the Court's attention through me so that [he] can comply with the orders of this Court.
>
> And I think that, based on all of [his] circumstances and the situation, I think there are unusual circumstances that would grant it.

The prosecutor also noted that McVicker's deposition would be admissible at the appellant's trial as former testimony pursuant to Tenn. R. Evid. 804(b)(1).

Upon further inquiry by the trial court, the prosecutor added that the State had subpoenaed 43 witnesses, and only McVicker and one additional witness had raised scheduling conflicts. Accordingly, the prosecutor noted that he would prefer to depose McVicker rather than request a continuance of the murder trial.

In response, defense counsel disputed that McVicker's testimony satisfied the definition of unavailability under either Tenn. R. Crim. P. 15 or Tenn. R. Evid. 804. Moreover, defense counsel disputed the existence of "exceptional circumstances" warranting McVicker's testimony by deposition.

In turn, the prosecutor suggested that the court reschedule the trial a week earlier than originally planned. Apparently, however, the parties were unable to reach an agreement on rescheduling. Ultimately, the trial court announced:

> I tell you what, in this matter go ahead and authorize the taking of the depositions, and we're going to start the trial as scheduled. And if [the State] insist[s] on wanting to advance the depositions, then I'll have to rule on that issue, but at this point in time I'll reserve it.

Although not entirely clear from the record, the deposition of McVicker seemingly occurred on the Friday immediately preceding the appellant's trial. According to the videotape, the trial court presided over the deposition, which was conducted in the courtroom. Moreover, both the prosecutor and defense counsel were present. Defense counsel was afforded the opportunity to proffer objections to the substance of McVicker's testimony and to the introduction into evidence of any exhibits thereto. Defense counsel was also afforded the opportunity to fully cross-examine McVicker. The videotape does not reveal whether or not the appellant was present.

As indicated previously, McVicker testified during the deposition that Ms. Coulter sought assistance from Domestic Violence Program, Inc., in Murfreesboro, Tennessee, on December 1, 1997. With the Program's assistance, she obtained from the Rutherford County Chancery Court an ex parte order of protection against the appellant. Exhibits to McVicker's testimony included a document signed by Ms. Coulter that sets forth the Program's "safety suggestions"; a copy of the Program's "disclaimer" form, also signed by Ms. Coulter; a copy of the ex parte order of protection; a copy of a pamphlet containing information about orders of protection; and a document containing information about available support groups and counseling services.

At the appellant's trial, the State sought to introduce into evidence both a videotape of McVicker's deposition and the accompanying exhibits. Defense counsel again interposed an objection. The trial court ruled:

> I'm going to overrule the objection and allow the testimony to be played by the video, although a strained construction of unavailable would be the fact that someone is on vacation, and there is authorization for the recording of testimony by video.
>
> And it appears that minimal confrontation is met by the Defendant being present at the time of this recording and the setting of the recording in the courtroom, all parties being here with the exception of the jury, which will have an opportunity to view this witness by this video process.

In accordance with the trial court's ruling, the State played the videotape to the jury and introduced into evidence the exhibits to McVicker's testimony.

### 2. Analysis

Tenn. R. Crim. P. 15(a) narrowly provides that the testimony of a witness may be taken by deposition "[w]henever due to exceptional circumstances of the case it is in the interest of justice that the testimony of a prospective witness of a party be taken and preserved for use at trial." Subsection (e) of Tenn. R. Crim. P. 15 further clarifies that the deposition may be used as substantive evidence at trial,

> so far as otherwise admissible under the Tennessee Rules of Evidence, . . . if:
>> (1) The witness is unavailable, as unavailability is defined in . . . this rule; or
>> (2) Upon motion and notice, it appears that such exceptional circumstances exist as make it desirable, in the interest of justice with due regard to the importance of presenting the testimony of witnesses orally in open court, to allow the deposition to be used.

The appellant relies exclusively upon the above rule in this appeal and does not raise a constitutional challenge to the State's use of the videotaped deposition. Nevertheless, we initially note that any interpretation of Tenn. R. Crim. P. 15 must be made against the backdrop of constitutional protections that inhere in the Confrontation Clause of the Sixth Amendment to the United States Constitution and Article 1, Section 9 of the Tennessee Constitution. It is against this backdrop that the Advisory Commission Comments to Tenn. R. Crim. P. 15 record the Commission's intent "that depositions be taken only in those cases wherein their use is clearly necessary, and that their taking not be authorized in other cases." As the United States Court of Appeals for the Sixth Circuit has observed, "[T]he deposition[, even when videotaped,] is a weak substitute for live testimony, a substitute that the Sixth Amendment does not countenance on a routine basis." Stoner v. Sowders, 997 F.2d 209, 213 (6th Cir. 1993).

We do not thereby mean to express an opinion that the trial court's ruling violated the appellant's right of confrontation; rather, we wish to underscore our doubt that a witness' vacation plans rise to the level of "exceptional circumstances" under Tenn. R. Crim. P. 15(a), even when balanced against the relatively minimal importance of his testimony. In any event, we need not resolve this issue, nor need we determine whether the State could use the deposition as substantive evidence at the appellant's trial. Even absent any error by the trial court, whether procedural or constitutional, the result of the trial would undoubtedly have been the same. We remain particularly unconvinced by the appellant's argument that the result of his trial was affected

by the introduction into evidence of the pamphlet containing information about orders of protection.[6] Quite simply, when one eliminates McVicker's testimony and the exhibits thereto, the evidence supporting the appellant's conviction remains overwhelming. This issue is without merit.

**k.      Prosecutor's Examination of Expert Witnesses Concerning the MMPI-II**

The appellant next contends, in essence, that the trial court erred in overruling his objections to the prosecutor's examination of both Dr. Weiss and Dr. Craddock concerning the Minnesota Multiphasic Personality Inventory, Second Edition (MMPI-II), the personality test that Dr. Weiss administered to the appellant on July 4, 1998.

**1.      Trial Court Proceedings**

Placing the appellant's contentions in the appropriate context, Dr. Weiss conceded during re-cross-examination that, in contrast to her testimony at trial, she had not indicated in any of her written reports that the appellant was unlikely to act with either intent or premeditation. She explained that she was not a forensic psychologist and that she was not accustomed to using legal terminology. Accordingly, the prosecutor inquired whether a forensic psychologist would "be in a better position" to evaluate the appellant's ability to act with intent and premeditation. Dr. Weiss responded that "[t]he forensic psychologist in this case was dealing solely with whether or not this man was capable of standing trial." The prosecutor then inquired whether Dr. Weiss was certain of the scope of Dr. Craddock's evaluation. Dr. Weiss responded affirmatively and, during the course of re-direct examination by defense counsel, clarified that she had reviewed Dr. Craddock's report prior to testifying at the appellant's trial.

Subsequently, due to Dr. Weiss' testimony that she had reviewed Dr. Craddock's report, the prosecutor brought to her attention the portion of the report that referred to the appellant's capacity at the time of this offense to form the requisite mental state for first degree premeditated murder. Dr. Weiss, in turn, expressed reservations concerning the credibility of Dr. Craddock's assessment of the appellant. She asserted that,

> in terms of the sophistication of what I did with him in the past and what testing they did, there's quite a bit of difference between their evaluation and my evaluation. . . .
>
> And there was quite a bit of difference between the rapport that I had with [the appellant] and what happened when he went for this evaluation thinking that he was going to get help. And when he realized that all that was going to happen was that he was going to be asked questions, he elected to respond in such a way to get out of there as quickly as possible. And that's what he told me.

---

[6]During McVicker's deposition, the appellant unsuccessfully objected to the admission of the pamphlet as an exhibit to McVicker's testimony. We note, however, that Detective Watson also identified and testified concerning the pamphlet at trial, and the appellant failed to proffer any objection. Nevertheless, it is at least arguable that "further objection would have been an idle ceremony and a useless gesture." State v. Brobeck, 751 S.W.2d 828, 833 (Tenn. 1988).

Thereafter, the prosecutor further questioned Dr. Weiss concerning the thoroughness of Dr. Craddock's evaluation, engaging her in the following colloquy:

| | |
|---|---|
| Prosecutor: | [The staff at MTMHI] talked to the Defendant's mother, did they not? |
| Dr. Weiss: | I have no idea whether they talked to the Defendant's mother. |
| Prosecutor: | They talked to the Defendant's ex-wife, Judy Prince, did they not? |
| Dr. Weiss: | I talked to her in 1993. |
| Prosecutor: | Yes, ma'am. They talked to her in 1998, didn't they? |
| Dr. Weiss: | I don't know. |
| Prosecutor: | They talked to Mr. Dean Wolfe, did they not? |
| Dr. Weiss: | How would I know? |
| Prosecutor: | So you didn't read the report then, is that what you're telling us? |
| Dr. Weiss: | Yes, I did read the report. |
| Prosecutor: | Well, is it not in there that they talked to these people and did you not read that? |
| Dr. Weiss: | No, I certainly didn't. The reports I have don't mention them at all. |
| Prosecutor: | Then you must have missed that part that he has the requisite mental state and is able to premeditate and act with intention like you missed the other parts of their report. . . . I don't have any further questions, Your Honor. |
| Defense Counsel: | I think she's entitled to answer that one. She may not even have that report. |
| Dr. Weiss: | Apparently, I don't. But the report that I do have says that he was administered two personality tests which have results that are perfectly compatible with the results of my personality tests, and they dismissed them and said that he obviously wasn't as bad off as the test results suggest. And I would suggest that when you have three personality tests that all come out with similar results, that you don't go dismiss them and say that they're meaningless. |

In light of Dr. Weiss' criticism that Dr. Craddock had "dismissed" the results of personality tests administered to the appellant, the prosecutor questioned Dr. Weiss concerning the appellant's performance on the MMPI-II, a personality test that was administered to the appellant

-53-

by Dr. Weiss in 1998 and that was mentioned in Dr. Craddock's report. Specifically, the prosecutor questioned Dr. Weiss concerning the appellant's performance on the "F Scale" portion of the MMPI-II, inquiring whether the F Scale measures symptom exaggeration or malingering. Dr. Weiss denied that the F Scale measures symptom exaggeration or malingering, noting that, "never from 1962 to 1999, 37 years, have I ever seen in print a suggestion that Scale F [is] a measure of malingering." Moreover, she noted that the appellant's performance on the "Scale 8" portion of the MMPI-II was "very high," and "[a]n elevation of the F Scale when it's found along with an elevation of Scale 8 in fact does not invalidate the MMPI." Without prompting by the prosecutor, Dr. Weiss volunteered that Scale 8 "is the schizophrenia scale."

In the face of Dr. Weiss' adamant denial that the F Scale measures symptom exaggeration or malingering, the prosecutor inquired if Dr. Weiss had ever read a book entitled The MMPI-2, A Practical Guide for Expert Witnesses and Attorneys in Court. Dr. Weiss denied any familiarity with the book. The prosecutor also inquired if Dr. Weiss had ever read a book entitled A Beginner's Guide to the MMPI-2, noting that the book's author was James M. Butcher. Dr. Weiss denied any familiarity with this latter book. Notwithstanding Dr. Weiss' response, the prosecutor attempted to question Dr. Weiss concerning the contents of Butcher's A Beginner's Guide to the MMPI-2 by reading an excerpt from the book. The appellant immediately interposed an objection, remarking that "[s]he said she's not aware of it, so he can't sit here and read out of it." The trial court sustained the appellant's objection.

Despite the trial court's ruling, the prosecutor subsequently handed Dr. Weiss a copy of Butcher's A Beginner's Guide to the MMPI-2 and asked her to read a paragraph from the book. The appellant again objected. The trial court sustained the appellant's objection but also ruled, "I'll allow him to ask the next question." The following exchange ensued between the prosecutor and Dr. Weiss:

Prosecutor: After 30 years have you now seen in print that the F Scale deals with malingering and faking?

Dr. Weiss: One person who wrote a book said that, but I am aware of the history of the MMPI, and I'm so old that I'm close to the history of the development of the MMPI.

Prosecutor: And James M. Butcher doesn't know what he's talking about.

The appellant interposed another objection, remarking that "[s]he hasn't had the opportunity to read that whole book to determine that. That's an unfair question." Despite the appellant's objection, the court permitted the prosecutor to briefly question Dr. Weiss concerning James M. Butcher's "association" with the MMPI-II. In this regard, Dr. Weiss acknowledged that Butcher "has a history with the early development of [the test]."

Following Dr. Weiss' testimony, the prosecutor also questioned Dr. Craddock concerning both the appellant's performance on the MMPI-II and Butcher's A Beginner's Guide to the MMPI-2. With respect to the latter, Dr. Craddock observed that the book

-54-

is a beginner's guide, which is easy reading so to speak, for somebody that's just becoming familiar with [the MMPI-II]. It's often used, I think, for courts because the terms are compatible with individuals who are not familiar with psychological testing.

Dr. Craddock further testified that "most anyone in the United States should be familiar with James Butcher if they use the MMPI-II, yes. He's probably one of the five most prominent individuals."

With respect to the appellant's performance on the MMPI-II, Dr. Craddock confirmed that, in evaluating the appellant's capacity to form the requisite mental state, he had reviewed the results of the MMPI-II administered to the appellant by Dr. Weiss. Moreover, like Dr. Weiss, he noted the elevation of the appellant's scores on both the F Scale and Scale 8 of the MMPI-II. He testified:

I agree with Dr. Weiss in that when someone is disturbed or psychotic or schizophrenic that there will be not only an elevation on Scale 8, but there will be another elevation on the F Scale. So I want to let you know that I agree with her that the two scales go up, not necessarily proportionally or equally, but there will be an elevation. But when there is an extreme elevation on the F Scale - - and this went essentially off the graph - - I have yet to find anybody who writes a text or does research who says that it's anything other than symptom exaggeration.

F Scales can be elevated for a variety of reasons. Not all of them are malicious. Some of them are benign. They can be a cry for help, a person that's trying to seek attention, and they're saying look how bad, look at the situation I'm in. That will elevate the F Scale. Another is a genuine, legitimate psychotic individual.

But typically to have an elevation on Scale 8 this high, the person would be so psychotic that you wouldn't be able to test them, that you wouldn't be able to keep their attention on the test instrument. They wouldn't be responding in a coherent fashion to you.

Another reason is inconsistency. If a person just sat down and started marking the true-false items just randomly, that can be another reason why the scale can be elevated. . . . [Y]ou can do an analysis, which I've tried to do here. It's called . . . a Variable Response Scale, which indicates whether the person was responding randomly or not. . . . [The Variable Response Scale indicated that the appellant] wasn't responding randomly.

In sum, Dr. Craddock opined that, in the appellant's case, the elevation of the F Scale did not stem from either paranoid schizophrenia or random responses; rather, the elevation stemmed from symptom exaggeration, possibly indicative of a "cry for help." According to Dr. Craddock, this

interpretation of the MMPI-II was consistent with the results of the "two personality questionnaires" administered by him to the appellant.

Following Dr. Craddock's testimony concerning the significance of the appellant's score on the F Scale of the MMPI-II, the prosecutor began to question Dr. Craddock concerning paranoid schizophrenia. The defense attorney objected, citing Tenn. R. Crim. P. 12.2(c). The prosecutor responded that Dr. Weiss had referred to the MMPI-II during her testimony, including the elevation of the appellant's scores on the scale that measures psychoses. He asserted that, therefore, the State was entitled to exclude paranoid schizophrenia as a mental disease or defect that diminished the appellant's ability to act with intent or premeditation at the time of this offense. Defense counsel noted in turn that the prosecutor had elicited the testimony concerning the MMPI-II. Defense counsel also emphasized that the appellant was not relying upon any diagnosis of paranoid schizophrenia to negate the requisite mental state but instead was relying upon a diagnosis of a closed head injury. The prosecutor then offered to stipulate that the appellant did not suffer from paranoid schizophrenia, but defense counsel refused the State's offer. Ultimately, the court ruled:

> We've got two interesting problems here that somewhat conflict. The rule contemplates one thing, but clearly the case law puts now the obligation on the State to, when there is expert testimony advanced, to rebut it with expert testimony. I think that policy prevails. I overrule the objection. But I would have to say that I caution you. You're in an area that has little or no guidance and may give grounds for problems in the future as far as appellate review.

Following the trial court's ruling, the prosecutor briefly questioned Dr. Craddock concerning paranoid schizophrenia. In this regard, Dr. Craddock testified that paranoid schizophrenia is a "mental disease" or "psychosis," involving a "break with reality, where the person is no longer accurately interpreting reality." Dr. Craddock clarified, however, that the only "mental disease" with which he had diagnosed the appellant was "an adjustment disorder," and the adjustment disorder did not preclude the appellant's ability to act either with intent or with premeditation. Moreover, Dr. Craddock carefully distinguished a "mental disease" from a "mental defect," and, as noted earlier, agreed with Dr. Weiss that the appellant was also suffering from a "mental defect" or brain damage. Again, Dr. Craddock concluded that, like the adjustment disorder, the appellant's brain damage did not preclude the appellant's ability to act with either intent or premeditation.

## 2. Analysis
### A. Impeachment of Dr. Weiss by "Learned Treatise"
Citing Tenn. R. Evid. 618, the appellant first contends that the trial court erred in overruling his objection to the State's use of Butcher's A Beginner's Guide to the MMPI-2 in cross-examining Dr. Weiss concerning the results of the MMPI-II. The State responds that, in fact, the trial court sustained the appellant's objections. We conclude that any error was harmless.

In reaching our conclusion, we agree with the State that "'[t]he propriety, scope, manner and control of the cross-examination of witnesses . . . rests within the sound discretion of the trial court.'" State v. Korsakov, 34 S.W.3d 534, 545 (Tenn. Crim. App. 2000); see also State v. Barnard, 899 S.W.2d 617, 624 (Tenn. Crim. App. 1994). Once again, however, the trial court's exercise of discretion is circumscribed by the Tennessee Rules of Evidence. As relevant to the current discussion, Tenn. R. Evid. 618 permits the use of "learned treatises," i.e., "statements contained in published treatises, periodicals, or pamphlets on a subject of history, medicine, or other science or art," to impeach an expert witness' credibility provided the following prerequisites are satisfied: (1) The treatise was called to the attention of the expert witness upon cross-examination or relied upon by the witness in direct examination; and (2) The treatise has been established as a reliable authority by the testimony or admission of the witness, by other expert testimony, or by judicial notice. We note that the adoption of this rule in 1990 was merely a restatement of current Tennessee law, which provided:

> "An expert witness may be cross-examined by the use of standard authorities on the subject. . . . 'When a witness is testifying as an expert, it is competent to test his knowledge and accuracy upon cross-examination by reading to him, or having him read, extracts from standard authorities upon the subject-matter involved, and then asking him whether he agreed or disagreed with the authorities, and comparing his opinion with those of the writer.'"

Nix v. State, 530 S.W.2d 524, 531 (Tenn. Crim. App. 1975)(quoting McCay v. Mitchell, 463 S.W.2d 710, 720 (Tenn. App. 1970))(citations omitted).

In accordance with Tenn. R. Evid. 618, the State brought Butcher's A Beginner's Guide to the MMPI-2 to Dr. Weiss' attention. However, the State failed to also lay a proper foundation establishing the book as a "reliable" or "standard" authority before attempting to impeach Dr. Weiss's credibility with its contents. Thus, as acknowledged by the State, the trial court sustained the appellant's objections to the State's use of the disputed book to impeach Dr. Weiss' credibility. Yet, notwithstanding these rulings, the trial court allowed the prosecutor to engage in further questioning of Dr. Weiss about the book, possibly seeking to afford the prosecutor an opportunity to lay a proper foundation, i.e., elicit testimony or an admission from Dr. Weiss concerning the book's status as a reliable or standard authority, including testimony concerning the reputation of the book's author. Rather than laying a foundation, the State established the pertinent contents of the book and further established that those contents were inconsistent with Dr. Weiss' testimony.

Despite the State's apparent circumvention of the trial court's earlier rulings, the appellant never attempted to clarify the trial court's rulings and never moved to strike the objectionable testimony from the record. Tenn. R. Evid. 103(a)(1); Tenn. R. App. P. 36(a). Moreover, the State arguably, albeit minimally, established the book as a "reliable authority" through Dr. Craddock's later testimony that the book was "often used . . . for courts" and that Butcher was one of the "five most prominent individuals" associated with the MMPI-II. But cf. Embree v. Norfolk & Western Railway Co., 907 S.W.2d 319, 325 (Mo. Ct. App. 1995)("It is proper to cross-

examine a medical expert with medical textbooks and treatises where there is evidence that the text or treatise so employed is authoritative. . . . To be authoritative, there must be some evidence of *general acceptance and accreditation of the text or treatise within the profession*.")(emphasis added). If Dr. Craddock's testimony adequately established a proper foundation under Tenn. R. Evid. 618, the timing of Dr. Craddock's testimony was not necessarily fatal to the State's use of the disputed book to impeach Dr. Weiss' credibility. See Tenn. R. Evid. 104(b).

In any event, any error does not appear to have affirmatively affected the results of the trial on the merits. Tenn. R. Crim. P. 52(a); Tenn. R. App. P. 36(b). We acknowledge that Dr. Weiss' testimony was the key component of the appellant's claim of diminished capacity. Moreover, Dr. Weiss partially explained her rejection of Dr. Craddock's assessment of the appellant's capacity to form the requisite mental state and, consequently, her adherence to her own assessment by noting Dr. Craddock's dismissal of the results of personality tests including the MMPI-II. By questioning Dr. Weiss concerning Butcher's treatise, the prosecutor clearly attempted to undermine this explanation. Nevertheless, the record contains abundant other evidence contradicting Dr. Weiss' testimony that it was "improbable" that the appellant was acting with reflection and judgment at the time that he killed his wife. This issue is without merit.

### B. Rebuttal Testimony by Dr. Craddock

The appellant next contends that the trial court erred in overruling the appellant's objection to rebuttal testimony by Dr. Craddock concerning the possibility that the appellant was suffering from paranoid schizophrenia. The appellant relies upon Tenn. R. Crim. P. 12.2(c) and contends:

> The testimony regarding schizophrenia comes from the MMPI test which was never testified to by Dr. Weiss. The State attacked Dr. Weiss' interpretation of the MMPI - which was never placed into evidence by the defendant - and Dr. Craddock was allowed to assail her unannounced and untestified to opinion both by contradicting the same with his own opinion and by introducing passages from treatises regarding the MMPI.

The State responds that Tenn. R. Crim. P. 12.2(c) was inapplicable to Dr. Craddock's testimony as the disputed testimony did not relate to statements made by the appellant during the course of a mental examination ordered by the trial court upon motion of the District Attorney General. Rather, the testimony related to the results of a test administered to the appellant during the course of a mental examination by the defense-retained psychologist. We conclude that the appellant is not entitled to relief.

Tenn. R. Crim. P. 12.2 provides that, when a defendant indicates his or her intent to rely upon a defense of insanity or a claim of diminished capacity,

> (c) . . . the court may, upon motion of the district attorney, order the defendant to submit to a mental examination by a psychiatrist or . . . other expert designated for this purpose in the order of the court. No statement made by the defendant in the course of any examination

provided for by this rule, whether the examination be with or without the consent of the defendant, no testimony by the expert based upon such statement, and no other fruits of the statement shall be admitted in evidence against the defendant in any criminal proceeding except for impeachment purposes or on an issue respecting mental condition on which the defendant has introduced testimony.

(Emphasis added). "The purpose of the rule is to provide the prosecution with a means to obtain necessary information to rebut evidence of mental condition presented by the defendant, while at the same time safeguarding a defendant's right against self-incrimination." State v. Huskey, 964 S.W.2d 892, 899 (Tenn. 1998). Due to the role of Rule 12.2 in safeguarding a defendant's right against self-incrimination, a trial court bears a significant responsibility to ensure that the prosecution complies with the rule in using any statements made by a defendant during a State-requested mental examination or any "fruits" thereof. State v. Martin, 950 S.W.2d 20, 25 (Tenn. 1997).

In this case, we agree with the State that Dr. Craddock testified concerning the results of a personality test administered by the appellant's own psychologist. Accordingly, at first glance, Rule 12.2(c) does not appear to encompass the disputed testimony. However, the appellant evidently submitted the results of the MMPI-II to Dr. Craddock for purposes of the State-requested examination. Arguably, the appellant thereby transformed the results of the MMPI-II into "statements" made or adopted by him during the course of a State-requested examination, inasmuch as the results reflect the appellant's responses to the questions composing the test.

In any event, under Tenn. R. Crim. P. 12.2(c), the State *could* use the results of the MMPI-II to impeach or rebut Dr. Weiss' testimony concerning the appellant's diminished capacity to premeditate his wife's murder. A careful examination of the record reveals that, in fact, the State used the results of the MMPI-II, including those reflecting paranoid schizophrenia, for precisely this purpose. Once again, Dr. Weiss volunteered during re-cross-examination that she discounted Dr. Craddock's conclusions about the appellant's capacity to premeditate his wife's murder because Dr. Craddock had dismissed the results of several personality tests including the MMPI-II. Accordingly, the prosecutor's subsequent questioning of *both* Dr. Weiss and Dr. Craddock[7] concerning the MMPI-II and the validity of the test results was clearly intended to impeach and rebut Dr. Weiss' explanation for discounting Dr. Craddock's opinion and adhering to her own.[8]

---

[7]Contrary to the appellant's assertion, Dr. Craddock at no time introduced "passages from treatises regarding the MMPI" in explaining his interpretation of the results of the MMPI-II.

[8]To the extent the appellant's objection either in the trial court or on appeal can be interpreted more broadly as a challenge to the scope of the State's rebuttal, the admissibility of rebuttal proof lies within the trial court's discretion and will not be reversed on appeal absent an abuse of that discretion. State v. Scott, 735 S.W.2d 825, 828 (Tenn. Crim. App. 1987); State v. Letivias Prince, No. M1998-00005-CCA-R3-CD, 2000 WL 1133572, at *6 (Tenn. Crim. App. at Nashville, August 10, 2000), perm. to appeal denied, (Tenn. 2001). Rebuttal proof is "any competent evidence which explains or is a direct reply to, or a contradiction of, material evidence introduced by the accused, or which is brought out on his cross-examination." State v. Smith, 735 S.W.2d 831, 835 (Tenn. Crim. App. 1987). Conversely, "[o]ne cannot rebut a proposition that has not been advanced." Cozzolino v. State, 584 S.W.2d 765, 768 (Tenn. 1979). In light

(continued...)

Finally, we note that, consistent with our conclusion, the appellant has at no time challenged under Rule 12.2(c) the prosecutor's re-cross-examination of Dr. Weiss concerning the MMPI-II. Moreover, momentarily setting aside the trial court's responsibility to ensure the prosecution's compliance with Rule 12.2(c), Dr. Craddock had already testified at length concerning the MMPI-II and disputed any implication that the results of the test supported a diagnosis of paranoid schizophrenia by the time the appellant proffered his Rule 12.2(c) objection. Tenn. R. App. P. 36(a). This issue is without merit.

### m.       Special Jury Instructions

The appellant next challenges the trial court's refusal to provide special instructions to the jury, maintaining that the trial court's charge was inadequate. The State responds that the trial court's instructions to the jury in the instant case were "full, fair, and accurately state[d] the law." State v. Kelley, 683 S.W.2d 1, 6 (Tenn. Crim. App. 1984). We agree with the State.

### 1.       Trial Court Proceedings

During the course of the appellant's trial, the appellant submitted a written request to the trial court that it provide the following special instruction to the jury:

> All homicide is presumed to be second degree murder and unless you
> find the State has proven beyond a reasonable doubt the defendant
> acted intentionally, that is with the conscious objective or desire to
> shoot and kill Ms. Coulter and with premeditation, that is acting only
> after the exercise of reflection and judgment then you must return a
> verdict of not guilty as to the charge of first degree murder.

Defense counsel argued that his requested instruction was an accurate statement of the law, and "the Defendant is entitled to have the jury charged on that presumption." The prosecutor principally responded that the requested instruction "is contrary to the order of deliberation that the Court will give to the jury." The trial court denied the appellant's request, ruling that he would charge the Tennessee Pattern Jury Instructions concerning the State's burden of proving first degree premeditated murder.

Additionally, the appellant submitted a written request to the trial court that it provide the following special instruction to the jury on the law of circumstantial evidence:

> The State has offered circumstantial evidence of Larry Coulter's state
> of mind; however, unless you determine the circumstantial evidence
> presented by the State is so strong and convincing as to totally
> exclude the possibility Mr. Coulter acted impulsively or otherwise
> without reflection and judgment you must return a verdict of not
> guilty as to the charge of first degree murder.

Defense counsel argued that the requested instruction "kind of fit[] the facts of this case into the pattern instruction." The prosecutor responded that the requested instruction impermissibly

---

[8](...continued)
of Dr. Weiss' volunteered remarks, we cannot say that the trial court abused its discretion.

enhanced the State's burden of proof and, moreover, disputed that the State's case was wholly circumstantial. The trial court denied the appellant's request, simply noting that "the pattern instruction appears to even be more instructive of this concept than your proposal."

## 2.    Analysis

A defendant has a "constitutional right to a correct and complete charge of the law." State v. Teel, 793 S.W.2d 236, 249 (Tenn. 1990). Accordingly, trial courts "should give a requested instruction if it is supported by the evidence, embodies a party's theory, and is a correct statement of the law." State v. Phipps, 883 S.W.2d 138, 150 n.20 (Tenn. Crim. App. 1994). However, trial courts need not give requested instructions if the substance of the instructions is covered in the general charge. State v. Zirkle, 910 S.W.2d 874, 892 (Tenn. Crim. App. 1995).

With respect to his requested instruction on the presumption of second degree murder, the appellant argues on appeal that "[t]he [trial court's] charge, as a whole, serves to confuse and not fully inform the jury as to the presumption the defendant is entitled to by law and the State's burden regarding the same." In this regard, we acknowledge our supreme court's observation in State v. Brown, 836 S.W.2d 530, 543 (Tenn. 1992), that "[t]he law in Tennessee has long recognized that once [a] homicide has been established, it is presumed to be murder in the second degree." However, the import of this presumption is that "[t]he state bears the burden of proof on the issue of premeditation . . . sufficient to elevate the offense to first-degree murder." Id.; see also State v. Hall, 8 S.W.3d 593, 599 (Tenn. 1999); State v. Schafer, 973 S.W.2d 269, 274 (Tenn. Crim. App. 1997). Therefore, when a trial court's charge omits the language of "presumption" but otherwise clearly informs the jury that the State carries the burden of proving each and every element of first degree premeditated murder beyond a reasonable doubt and also includes a correct and complete instruction on second degree murder, a criminal defendant is not entitled to relief. See, e.g., State v. Mann, 959 S.W.2d 503, 521 (Tenn. 1997)(appendix); State v. Kelley, 683 S.W.2d 1, 6 (Tenn. Crim. App. 1984); State v. Andrew Young Johnson, No. E1999-00002-CCA-R3-CD, 2000 WL 420662, at *9 (Tenn. Crim. App. at Knoxville, April 18, 2000), perm. to appeal denied, (Tenn. 2000); State v. Joe A. Ivy, No. 02C01-9707-CR-00273, 1998 WL 813405, at *10 (Tenn. Crim. App. at Jackson, November 25, 1998). Moreover, this court has noted that, should a jury decline to find a defendant guilty of the charged offense of first degree premeditated murder, the instruction requested in this case may pose a danger of assigning the burden of proof to the defendant to disprove his guilt of second degree murder. State v. Thomas J. McKee, No. 03C01-9603-CR-00092, 1998 WL 202475, at **4-5 (Tenn. Crim. App. at Knoxville, April 28, 1998). In short, the trial court's general charge to the jury in this case fully encompassed the substance of the requested instruction while avoiding the danger articulated in McKee.

With respect to his requested instruction on circumstantial evidence, the appellant argues that the trial court's charge was inadequate as the trial court failed to conform it to the specific facts of this case. In particular, the appellant asserts that, due to their "general, non-specific nature," "[t]he pattern instructions charged by the Court do not make it clear to the jury the defendant's contention was he . . . act[ed] impulsively or otherwise without reflection and judgment."

Notwithstanding the appellant's contentions, we preliminarily note that his requested instruction on circumstantial evidence is an incorrect statement of the law. The State's proof connecting the appellant to the commission of this offense was both direct and circumstantial. In other words, while the evidence supporting the jury's finding of the requisite mental state was wholly circumstantial in nature, the evidence supporting the appellant's guilt of killing Ms. Coulter included direct evidence, namely the appellant's statements to the police. Cf. Mann, 959 S.W.2d at 518 (appendix); State v. Caldwell, 671 S.W.2d 459, 462-463, 466 (Tenn. 1984); State v. Thompson, 519 S.W.2d 789, 793 (Tenn. 1975); State v. Harold Wayne Shaw, No. 01C01-9312-CR-00439, 1996 WL 611158, at *3 (Tenn. Crim. App. at Nashville, October 24, 1996); State v. Gregory Wayne Young, No. 03C01-9311-CR-00379, 1994 WL 421413, at **1-2 (Tenn. Crim. App. at Knoxville, August 12, 1994); State v. Mark Anthony Hopper, No. 03C01-9202-CR-00064, 1992 WL 340580, at **1-2 (Tenn. Crim. App. at Knoxville, November 20, 1992). When the State's proof is both direct and circumstantial, "it is not necessary for a conviction that a defendant's innocence must be excluded from every reasonable hypothesis deducible from the circumstances." Pearson v. State, 226 S.W. 538, 541 (Tenn. 1920); see also Shaw, No. 01C01-9312-CR-00439, 1996 WL 611158, at *3; State v. Bobby W. Lineberry, No. 01C01-9412-CC-00439, 1995 WL 441608, at *4 (Tenn. Crim. App. at Nashville, July 26, 1995).[9]

Nevertheless, in Monts v. State, 379 S.W.2d 34, 41 (Tenn. 1964), our supreme court held that, "when the evidence introduced against the defendant is both circumstantial and direct and the defendant requests a charge on the law of circumstantial evidence, it is reversible error to refuse to give it." Our supreme court explained:

> When a case is grounded on both circumstantial and direct evidence, it is entirely possible that the jury, in the exercise of its function as the sole judge of the credibility of the evidence, may find that the direct evidence is unworthy of belief. If they should so find, then they would be left with only the circumstantial evidence to guide them in determining whether the defendant is guilty of the offense charged. . . . Th[is] possibility . . . makes it imperative that the trial judge instruct the jury on the law of circumstantial evidence.

Id.

In this case, the trial court in fact instructed the jury on circumstantial evidence in accordance with T.P.I. Crim. No. 42.03 (4th ed. 1995). We have previously acknowledged that, generally speaking,

---

[9]We acknowledge that in Schafer, 973 S.W.2d at 273, we observed, "[C]ircumstantial evidence of a defendant's state of mind will not support a jury verdict of premeditated murder unless the proof of premeditation . . . is 'so strong and cogent as to exclude every other reasonable hypothesis save the guilt of the defendant, and that beyond a reasonable doubt." However, we made this observation in the context of a case in which evidence of *both* the killing and the appellant's state of mind at the time of the killing was wholly circumstantial. But see State v. John W. Gilliam, No. 01C01-9603-CC-00105, 1997 WL 230156, at **2-3 (Tenn. Crim. App. at Nashville, May 7, 1997); State v. James Dumas, No. 02C01-9502-CR-00031, 1995 WL 580931, at **1-4 (Tenn. Crim. App. at Jackson, October 4, 1995).

> [t]he Tennessee pattern jury instructions are just that, pattern
> instructions. They are not sanctioned by the Supreme Court or the
> legislature. It remains "the responsibility of the trial judge to prepare
> the jury instructions [and to] revise[ ] or supplement[ ] [previously
> printed forms] if necessary in order to state the applicable law fully
> and accurately."

Phipps, 883 S.W.2d at 152 (citations omitted)(alterations in original).  Nevertheless, our supreme court has specifically approved instructions on circumstantial evidence identical to the pattern instructions utilized by the trial court in this case.  State v. Vann, 976 S.W.2d 93, 113-114 (Tenn. 1998)(appendix); State v. Bane, 853 S.W.2d 483, 487-488 (Tenn. 1993).

Finally, jury instructions must be reviewed in the context of the overall charge rather than in isolation.  State v. Bolin, 678 S.W.2d 40, 43 (Tenn.1984).  Reviewing the charge "in its entirety" and reading it "as a whole," Vann, 976 S.W.2d at 101, we conclude that it fairly submitted to the jury the issue of the appellant's mental state at the time of this offense.  Indeed, the trial court provided the following instruction to the jury:

> Now, the State must prove beyond a reasonable doubt the culpable
> mental state of the accused.  Culpable mental state means the state of
> mind of the accused at the time of the offense.  This means that you
> must consider all the evidence to determine the state of mind of the
> accused at the time of the commission of the offense.  The state of
> mind which the State must prove for first degree murder is that the
> Defendant acted intentionally and with premeditation in killing Ms.
> Coulter.
>
> In this case you have heard evidence that the Defendant might have
> suffered from a mental defect which could have affected his capacity
> to form the culpable mental state required to commit a murder in the
> first degree.  If you find from the evidence that the Defendant's
> capacity to form a culpable mental state may have been affected, then
> you must determine beyond a reasonable doubt what the Defendant's
> mental state was at the time of the commission of the offense to
> determine of which, if any, offense he's guilty.

See T.P.I. Crim. No. 42.22 (4th ed. 1995).  This issue is without merit.

**n.    Redaction of Exhibit 45**

The appellant next contends that the trial court erred by permitting the State to redact a portion of an exhibit following the trial court's charge to the jury and immediately prior to the submission of the exhibits to the jury for deliberations.  The appellant contends that the trial court's ruling was in contravention of the Tennessee Rules of Evidence and also violated the appellant's rights to due process of law and to confrontation of witnesses.  The State responds that the trial court did not abuse its discretion in redacting the report and, moreover, that any error was harmless.  In

particular, the State notes that the "redacted" portion is, in fact, legible.  We conclude that the appellant is not entitled to relief.

### 1.      Trial Court Proceedings

Immediately following the trial court's charge to the jury, the prosecutor asked to approach the bench.  At the bench, the prosecutor further requested that the jury be excused from the courtroom for deliberations but that the exhibits be temporarily withheld.  The trial court agreed, and the jury retired to the jury room without the exhibits.  At this point, the State asked that a portion of Exhibit 45, Dr. Craddock's report, be redacted.  Specifically, the prosecutor requested the redaction of the following sentence: "When Dr. Weiss assessed Mr. Coulter in July 1998 she concluded 'Mr. Coulter is manifesting symptoms of paranoid schizophrenia."  In conjunction with its request, the prosecutor assured the court that the jury had not yet examined Exhibit 45.  Defense counsel responded:

> I understood we were putting the whole report in and not picking and
> choosing parts, and I don't think it would be appropriate at this time
> to pick and choose parts.  It was put in that way, not by us, and that's
> the way it ought to go back there.  They ought to be entitled to see
> everything that went into their conclusions, and that's part of it.

In response, the prosecutor noted defense counsel's previous objection to Dr. Craddock's testimony concerning paranoid schizophrenia.  Defense counsel noted, in turn, that the trial court had overruled his objection.  Nevertheless, the prosecutor maintained that, due to cautionary remarks by the trial court, he had truncated his examination of Dr. Craddock concerning paranoid schizophrenia.  Ultimately, the trial court granted the State's motion and submitted Exhibit 45 to the jury in redacted form.

### 2.      Analysis

In support of his challenge on appeal, the appellant specifically argues that, due to the timing of the State's motion to redact Dr. Craddock's report, he was "denied the right to the protections afforded within Tenn. R. Evid. 106 in that the defendant was unable to present the remaining parts of the report during the State's proof."  The appellant also cites Tenn. R. Crim. P. 30.1 for the proposition that the trial court was required to submit the exhibit to the jury in substantially the same form in which it was originally received into evidence.  Finally, the appellant asserts that "allowing the State to alter or amend evidence after the jury has retired to deliberate presents a matter of fundamental unfairness and amounts to a denial of the defendant's fundamental due process rights and the ability to cross-examine."  We simply conclude that any error by the trial court was harmless beyond a reasonable doubt.

Initially, we note the appellant's adamant assertions elsewhere in his brief that he relied exclusively upon his diagnosed closed head injury in presenting a claim of diminished capacity.  These adamant assertions are borne out by both the appellant's closing argument and the trial court's instruction to the jury concerning the appellant's claim of diminished capacity, both of which addressed the impact of a "mental defect" upon the appellant's ability to form the requisite mental state.  In any event, the testimony of both Dr. Weiss and Dr. Craddock clearly revealed that,

in 1998, the appellant produced "very high" scores on a test intended to detect psychoses including paranoid schizophrenia, although the psychologists differed concerning the significance of these scores. Moreover, we agree with the State that the disputed sentence in Dr. Craddock's report, although marked over with black pen, is legible. Finally, once again, the evidence contradicting the appellant's claim of diminished capacity was overwhelming. This issue is without merit.

**n.    Sufficiency of the Evidence**

The appellant also challenges the sufficiency of the evidence supporting his conviction of first degree premeditated murder. Specifically, the appellant challenges the jury's finding of premeditation. The State disagrees. We have repeatedly expressed our view concerning the volume of evidence supporting the jury's finding of premeditation. However, we will take this opportunity to more fully set forth the legal standards underlying our conclusion.

In order to successfully challenge the sufficiency of the evidence supporting his conviction, the appellant must demonstrate to this court that no "rational trier of fact" could have found the essential elements of first degree premeditated murder beyond a reasonable doubt. Jackson v. Virginia, 443 U.S. 307, 319, 99 S. Ct. 2781, 2789 (1979); State v. Tuggle, 639 S.W.2d 913, 914 (Tenn. 1982); Tenn. R. App. P. 13(e). In other words, on appeal, the State is entitled to the strongest legitimate view of the evidence and all reasonable inferences which may be drawn therefrom. State v. Williams, 657 S.W.2d 405, 410 (Tenn. 1983). Questions concerning the credibility of witnesses and the weight and value to be given the evidence, as well as all factual issues raised by the evidence, are resolved by the trier of fact, and not the appellate courts. State v. Pruett, 788 S.W.2d 559, 561 (Tenn. 1990). These standards apply to convictions based upon direct evidence, circumstantial evidence, or both. State v. Carruthers, 35 S.W.3d 516, 557 (Tenn. 2000); State v. Vann, 976 S.W.2d 93, 111 (Tenn. 1998)(appendix). Thus, as in the case of direct evidence, the weight to be given circumstantial evidence and "'[t]he inferences to be drawn from such evidence, and the extent to which the circumstances are consistent with guilt and inconsistent with innocence, are questions primarily for the jury.'" Marable v. State, 313 S.W.2d 451, 457 (Tenn. 1958).

The principal issue at the appellant's trial was whether or not the appellant premeditated the murder of his wife, and, as always, the State bore the burden of proof on this issue. Tenn. Code. Ann. § 39-13-202(a)(1); see also State v. Hall, 8 S.W.3d 593, 599 (Tenn. 1999); State v. Brown, 836 S.W.2d 530, 543 (Tenn. 1992); State v. Schafer, 973 S.W.2d 269, 274 (Tenn. Crim. App. 1997). In satisfying this burden, the State could rely entirely upon circumstantial evidence. Brown, 836 S.W.2d at 541. Indeed, as indicated elsewhere in this opinion, "[o]ther than an accused stating what his or her purpose, intent, or thinking was at the relevant times, the trier of fact is left to determine the [requisite] mental state by making inferences from the surrounding circumstances it finds to exist." State v. Carlos C. Beasley, No. W1999-00426-CCA-R3-CD, 2000 WL 527715, at *4 (Tenn. Crim. App. at Jackson, May 2, 2000), perm. to appeal denied, (Tenn. 2001).

Premeditation necessitates both a previously formed intent to kill and the exercise of reflection and judgment. Tenn. Code. Ann. § 39-13-201(b)(2) (1997). Circumstances from which a jury may infer premeditation include planning activity by a defendant prior to the killing; the

defendant's prior relationship with the victim; and the manner of the killing. State v. Hall, 958 S.W.2d 679, 704 (Tenn. 1997); see also State v. Jones, 15 S.W.3d 880, 889 (Tenn. Crim. App. 1999); Schafer, 973 S.W.2d at 273; State v. Bordis, 905 S.W.2d 214, 222 (Tenn. Crim. App. 1995); State v. Gentry, 881 S.W.2d 1, 4-5 (Tenn. Crim. App. 1993). Thus, for example, our supreme court has held that premeditation may be inferred from a defendant's use of a deadly weapon upon an unarmed victim; the cruelty of the killing; declarations by a defendant of an intent to kill; the defendant's procurement of a weapon; a defendant's preparations prior to a killing for concealment of the crime; and calmness immediately after the killing. State v. Pike, 978 S.W.2d 904, 914 (Tenn. 1998); State v. Bland, 958 S.W.2d 651, 660 (Tenn. 1997).

In this case, the State overwhelmingly proved premeditation by adducing, in particular, the following proof: evidence of the Coulters' extremely troubled relationship, culminating immediately prior to this offense in the service of an ex parte order of protection upon the appellant; testimony concerning the appellant's statements to co-workers prior to this offense that he was contemplating killing his wife; and the appellant's devastating confession to the police.

Notwithstanding this evidence, the appellant argues that Dr. Weiss' testimony precluded the jury's finding of premeditation. Under Tennessee law, a criminal defendant may introduce expert testimony concerning the impact of any mental disease or defect upon his capacity to form the requisite mental state for first degree premeditated murder. Hall, 958 S.W.2d at 688-690; State v. Abrams, 935 S.W.2d 399, 402 (Tenn. 1996); State v. Phipps, 883 S.W.2d 138, 149 (Tenn. Crim. App. 1994). Such testimony may warrant "an acquittal of the indicted offense and a conviction for a lesser included offense." State v. Perry, 13 S.W.3d 724, 734 (Tenn. Crim. App. 1999); see also Hall, 958 S.W.2d at 688. However, a jury is not required to accept the expert testimony to the exclusion of all other evidence. State v. Nesbit, 978 S.W.2d 872, 886 (Tenn. 1998); State v. Holder, 15 S.W.3d 905, 912 (Tenn. Crim. App. 1999), perm. to appeal denied, (Tenn. 2000); State v. Shawnda James, No. 01C01-9803-CC-00093, 1999 WL 618886, at *7 (Tenn. Crim. App. at Nashville, August 11, 1999), perm. to appeal denied, (Tenn. 2000); State v. Verlin Ralph Durham, No. 03C01-9802-CR-00063, 1999 WL 528726, at *11 (Tenn. Crim. App. at Knoxville, July 26, 1999), perm. to appeal denied, (Tenn. 2000). In the face of the circumstantial evidence presented by the State, the jury acted well within its prerogative in rejecting Dr. Weiss' testimony that, due to a mental defect, it was "improbable" that the appellant was acting with reflection and judgment at the time that he killed his wife. Cf., e.g., State v. Mabel J. Longmire, No. W1999-00216-CCA-R3-CD, 2001 WL 128561, at *5 (Tenn. Crim. App. at Jackson, February 15, 2001)("While there was significant expert testimony that Defendant was suffering from a major depressive disorder at the time she killed the victim, and that this "mental disease" affected her ability to function with regard to judgment and other cognitive skills, this does not require a finding that Defendant lacked the capacity to premeditate."). This issue is without merit.

**n.    Cumulative Error**

Finally, the appellant contends that the combination of errors committed in the trial court denied him a fair trial. State v. Brewer, 932 S.W.2d 1, 28 (Tenn. Crim. App. 1996). We have carefully reviewed the record in this case and have considered those issues that have not been waived

by the appellant.  We have concluded that any errors occurring in the trial court were harmless and neither singly nor collectively require the reversal of the appellant's conviction.  This issue is without merit.

### III.  Conclusion

For the foregoing reasons, we affirm the judgment of the trial court.

_____
NORMA McGEE OGLE, JUDGE